**STATE of Tennessee**

**v.**

**Jamie Scott BROCK.**

Court of Criminal Appeals of Tennessee, at Knoxville.

March 25, 2008 Session.

June 29, 2009.

Application for Permission to Appeal Denied by Supreme Court Jan. 25, 2010.

Wesley D. Stone, Franklin, Tennessee, for the appellant, Jamie Scott Brock.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General, and Jared Effler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. McLIN, JJ., joined.

The Claiborne County Grand Jury indicted Appellant, Jamie Scott Brock, for the murder of his wife. After a lengthy trial, he was convicted of first degree murder and sentenced to life in prison. He now appeals his conviction. He does not appeal his sentence. Appellant argues several issues on appeal: (1) the trial court erred in denying his motion to suppress; (2) the trial court erred in excluding evidence of three anonymous letters; (3) the trial court erred in allowing evidence in at the trial concerning the autopsy because the order was illegally obtained; (4) the trial court erred in admitting autopsy photographs into evidence; (5) the trial court erred in denying his motion to dismiss based upon the State's failure to preserve evidence; (6) the trial court erred in allowing the State to introduce evidence through a rebuttal witness; and (7) the evidence was insufficient to support his conviction. After a thorough review of the record and the law, we affirm the judgment of the trial court.

On the morning of August 28, 2005, Appellant's wife was found beaten to death in their bedroom. Appellant was arrested after confessing to the murder during a polygraph examination. In December of 2005, the Claiborne County Grand Jury indicted him for one count of first degree murder.

### Motion to Suppress

On March 29, 2006, Appellant filed a motion to suppress evidence. In this motion, Appellant requested that items taken from or photographs taken at the Appellant's home, which was also the site of the murder, were taken without a warrant of any kind and prior to his arrest. Appellant also sought to suppress the items taken from his truck based upon the fact that there was no warrant. He argues that these seizures violated his Constitutional rights and should, therefore, be suppressed.

On July 27 and 28, 2006, the trial court held a hearing on Appellant's motion to suppress. Several witnesses were called at this hearing. J.D. Tolliver, the victim's father, was the first witness. He testified that early in the morning on the date of the murder Appellant called him to say that he could not get in touch with the victim. Mr. Tolliver stated that he called the victim but received no answer. Mr. Tolliver went to his daughter's house to check on her. When he got to her house, the door was unlocked, and he went inside. Mr. Tolliver first looked for his daughter in his grandchildrens' room. She was not in their room, but he found them asleep in their beds. Mr. Tolliver proceeded to his daughter's bedroom. When he turned on the light, he saw blood everywhere and his daughter in the corner of the room. He called 911. Mr. Tolliver took the children

to a neighbor's house. Mr. Tolliver did not notice that anything in the house had been disturbed. The police arrived shortly thereafter. The officers entered the house. An ambulance also arrived on the scene.

Detective Rick Davis with the Claiborne County Sheriff's Department was the next witness to testify. He received a notification of a serious crime just before 7:00 a.m. on the morning of August 29, 2005. Officer Robert Chadwell was the first officer to arrive on the scene. Detective Davis was about six minutes behind Officer Chadwell. An ambulance was already there when Detective Davis arrived. When he arrived, Detective Davis first spoke with Mr. Tolliver about what had happened. Mr. Tolliver told him that Appellant had called him to check on the victim. Appellant told Mr. Tolliver that he had called the victim several times, and she had not answered the telephone. After speaking with Mr. Tolliver, Detective Davis approached Officer Chadwell who was in the victim's bedroom. While walking to the bedroom, Detective Davis noticed small blood splatters on the floor of the kitchen and in the bathroom, as well as some blood smears on the wall. Detective Davis noticed numerous pieces of evidence in the bedroom that were clearly visible. Detective Davis did not notice that anything was obviously disturbed elsewhere in the house. Detective Davis also checked the exterior of the house for forced entry but found nothing. Detective Davis checked the telephone caller i.d. and answering machine. There were two calls, one at 6:36 a.m. and one at 6:38 a.m. The calls were from the victim's sister's house and the victim's parents' house. There was also a message from a female asking "Where are you at? Jamie is looking for you."

When other family members arrived, Detective Davis asked them questions about Appellant, such as what kind of vehicle he drove, where he worked, and what kind of work he did. They told Detective Davis that Appellant worked for an insulation company with family members, and they thought he was working around Walters State Community College in Morristown that day. The family also told Detective Davis that Appellant drove a small white pick-up truck. A neighbor told Detective Davis that Appellant usually left early in the morning for work. Detective Davis put out a "be on the lookout" ("BOLO") for Appellant's truck. Detective Davis issued the BOLO because there had been a serious crime committed at Appellant's house; he was concerned for Appellant's safety; and Appellant needed to be informed of what had happened at his house. At some point, Detective Davis discovered that Appellant was returning to the house with another individual who turned out to be Michael Miller, the victim's brother-in-law. Detective Davis was not originally thinking of Appellant as a suspect. Detective Davis wanted to see Appellant's truck because it was the last known vehicle to leave the house. At the time that Appellant was being brought to his home, the baseball bat and bicycle had not been found.

Detective David Daniels arrived after Detective Davis. The first-responding officers pointed out some blood on the door of the victim's house to Detective Daniels. Detective Daniels got his camera and went into the house to survey the scene. Detective Daniels took some pictures of blood on the door frame, blood on the countertop in the kitchen and a small pantry, blood smears in the hallway leading to the bedroom, as well as pictures of the scene in the bedroom. Detective Daniels stated that the officers did not have a warrant or consent to search the home at that point,

but he contended that exigent circumstances existed due to the blood on the back door and the fact that the officers did not know if someone was still inside the house.

Detective Harrison Cornett, with the Claiborne County Sheriff's Department, arrived shortly thereafter and the law enforcement officers decided to call the Tennessee Bureau of Investigation ("TBI"). Detective Cornett did not notice any disturbance in the house such as someone trying to find valuables. After arriving at the scene and viewing the victim, Detective Cornett went back outside. While outside he walked around the house and found no evidence of a forced entry. Detective Cornett was told that Appellant's vehicle had been found at Walters State Community College. At this point, Detective Cornett and Sergeant Cline left the scene to go to Morristown. On the way to Morristown they passed Appellant and his brother-in-law returning to the scene. The officers notified Officer Seals. They told Officer Seals that Appellant would be safer arriving at the scene in his patrol car because many people had gathered at the scene before he left. Detective Cornett did not intend for Officer Seals to arrest Appellant at that time. The officers located the vehicle around 10:00 or 10:30 a.m. in a public parking area. It was locked. Officers with the Morristown Police Department were watching the vehicle. They did not search the vehicle in the parking lot because it was locked. The officers called a tow truck to have the vehicle towed to Claiborne County to the tow truck owner's garage where the vehicle was locked inside the building. The T.B.I. searched the vehicle later that night. Detective Cornett called a locksmith to have the locks "popped" on the vehicle.

Ms. Judy Faye Miller, the victim's sister, testified that she worked for Breeding Insulation with the Appellant at the time of the incident. Appellant was working at Walters State Community College and Mrs. Miller's husband, Michael Miller, would work with him sometimes. On the date in question, Mrs. Miller was not at work. She received two or three telephone calls from Appellant asking if she had spoken with the victim that morning. She called the victim's house and her parents' house, and no one answered the telephone at either residence. Around 7:30 or 8:00 a.m., she spoke with Appellant and told him she called the school to see if the victim had gone to work. When she discovered that the victim was not at work, she went to the victim's house and discovered what had happened. She spoke with the officers and told them where Appellant was working that day. Mrs. Miller called her husband and told him to get Appellant and bring him home because, "Someone has broke in on [the victim] and she's gone." The officers did not tell Mrs. Miller to get Appellant back to the house. She made that decision on her own. When Appellant and Mr. Miller were on their way to the house, Appellant asked Mrs. Miller what had happened. She did not want to tell him over the phone, so she hung up on him. When Appellant called back she did not answer the telephone. When Appellant arrived at the house, he arrived in a patrol car. Mr. Miller arrived in his vehicle at approximately the same time. When Appellant arrived, there were around forty people at the house. The next time Mrs. Miller spoke with Appellant was later in the afternoon. He called, and the conversation lasted forty-five minutes with the telephone being passed amongst her family and Appellant's family. Mrs. Miller was still at the scene during that telephone conversation. She stayed at the scene until her sister's body was removed. Mrs. Miller next spoke with Appellant around 5:00 in the evening. He told her

the police were going to keep him overnight and give him a polygraph test.

Officer Jimmy Seals with the Claiborne County Sheriff's Department was working on the morning in question. He spoke with Sergeant Cline and Detective Cornett, who asked Officer Seals to escort the car in which Appellant was being driven by his brother-in-law from Morristown to the scene. Officer Seals began to follow the car in his marked patrol car. He had not turned on his lights. Shortly thereafter, Sergeant Cline told Officer Seals to pull the vehicle over, Mirandize Appellant, and place Appellant in his patrol car to be driven the rest of the way to the scene. Officer Seals followed the instructions. It is Officer Seals's practice to frisk any individuals before he puts them in his patrol car. He frisked Appellant for his safety and asked Appellant to empty his pockets. Officer Seals found no weapons on Appellant's person. He informed Appellant of his *Miranda* rights. Appellant responded that he understood. Appellant was placed in the back of the patrol car. Appellant never objected to being placed in the back of the patrol car. Appellant was neither handcuffed nor placed in leg shackles. Appellant did not ask for a lawyer at this time. When they arrived at Appellant's residence, there were several people there. A TBI agent came to Officer Seals's patrol car and sat in the back with Appellant. Officer Seals remained outside. He did not hear any of the conversation. When the TBI agent got out of the car, he told Officer Seals to take Appellant to the CID ("Criminal Investigation Division") Building. Officer Seals drove Appellant to the CID Building and waited for the TBI agent to arrive. When the TBI agent arrived, Officer Seals let Appellant out of the car.

TBI Agent James Whitson was asked to lead the investigation into the victim's death. He first went to the scene. When he arrived, there were several people gathered around the house. He entered the house through the back door and walked through the kitchen, where there was blood on the floor. He walked through the hall and saw blood in the bathroom and finally arrived in the bedroom. In the bedroom, he found the victim lying against the dresser and the back wall. Agent Whitson noted that there was blood all over the room. Officers at the scene informed Agent Whitson that the victim's husband had left for work that morning and was at Walters State Community College. He was also advised that the Sheriff's Department was bringing Appellant, the victim's husband to the scene. Agent Whitson told the officers that he needed to speak with Appellant as soon as he arrived. When Officer Seals arrived, at about 9:45 a.m., Agent Whitson went to the patrol car and got into the back with Appellant. Once in the back of the patrol car, Agent Whitson could not get out without someone outside opening the door. He and Appellant were the only people in the patrol car.

Agent Whitson informed Appellant that his wife was dead, and Appellant put his head in his hands. Appellant asked what happened. Agent Whitson told him they were trying to find out, but he needed Appellant's permission to search the house. Appellant consented and signed a form giving the officers permission to search the house. Agent Whitson opened the door and called Officer Chadwell over to witness the signing of the document. Agent Whitson also asked for permission to search Appellant's car, and Appellant also gave permission for that search. Officer Chadwell again witnessed the signing of the consent to search the car. Appellant never asked to get out of the patrol car. He did not ask to speak with anyone at the scene. Agent Whitson asked Appel-

lant to come back to the detective's office at the CID so that Agent Whitson could get a statement from Appellant about what had happened that morning. Appellant agreed to go to the CID Building. There was no discussion as to how Appellant would get there. Appellant was able to hear Agent Whitson ask Officer Seals to take Appellant to the CID Building. Appellant did not request to go with someone else. He said he would be happy to go.

When they had both arrived at the CID Building, Agent Whitson took Appellant into the interview room. Detective Daniels and Agent Whitson were in the room and asked Appellant if he wanted something to drink. The officers sat down at the table with Appellant and started the interview. They did not advise him of his *Miranda* rights at this time, but Agent Whitson had been advised that Officer Seals had already Mirandized Appellant. There was no discussion as to whether Appellant was in custody. Agent Whitson told Appellant that he appreciated him coming down to give a statement. Appellant never asked the officers if he was under arrest.

The officers began taking a statement from Appellant by allowing Appellant to tell them the events that occurred that morning. Agent Whitson took notes and then wrote out a written statement. Agent Whitson read the written statement to Appellant, who then signed the statement. This occurred at about 1:42 p.m. During the interview, Agent Whitson did not make any accusations toward the Appellant, but he did ask him if he had anything to do with the murder. Appellant replied that he did not, as is reflected in the statement.

After the statement had been signed, the officers asked Appellant if they could take his clothes from him. They wanted to test them for blood. Appellant did not object and signed a written document allowing his clothes to be tested. Appellant never hesitated to give permission and did not ask any questions. This occurred at 2:10 p.m. that day. The officer gave Appellant a jail uniform to wear. Agent Whitson told Appellant, "I want you to understand you're not under arrest, but this is the only thing we've got to put you in. We don't want you running around in your underwear." Appellant stated that he understood. Agent Whitson told Appellant he wanted him to take a polygraph test. The only polygraph person in the area was in Chattanooga. Agent Whitson told this to Appellant. Agent Whitson asked Appellant if he would mind waiting until the polygraph examiner could get there from Chattanooga. Appellant replied that as long as his children were being taken care of, he had no place to go. The officers asked if he was hungry. Appellant replied that he was not. At some point, the officers had some sandwiches sent up for Appellant. Appellant did have his cellphones throughout this time and was in and out of the interview room. Appellant was not prevented from going outside the building, and he did so to talk on his cell phone. Appellant was not questioned by any officers regarding the case in the time period during which they waited for the polygraph examiner.

While Appellant waited for the polygraph examiner, Agent Whitson returned to the scene. When he got there, Agent Andy Corbitt informed Agent Whitson that a bloody baseball bat had been recovered 295 feet away from the victim's house in a field. Later, Agent Whitson was informed that an individual had found a bloody bicycle on the side of the road near the victim's house, had taken it home and washed off the blood. The baseball bat was found around 11:30 a.m. and the bicycle was found around 12:52 p.m. Around

4:45 p.m., officers received an anonymous telephone call informing them that the Appellant was having an affair with Bambi Williams.

Detective Daniels was with Agent Whitson when he walked to Officer Seals's patrol car to speak with Appellant. Detective Daniels was not in the car. Detective Daniels went with Agent Whitson to the CID Building to take a statement from Appellant. Detective Daniels also had Appellant sign an affidavit of autopsy and sign a release of information on himself and his wife. This occurred before Appellant's first statement. The release of information is to get health and financial records, if needed. Appellant did not object in any way to signing the affidavit of autopsy or the release of information. When Detective Daniels and Agent Whitson entered the room with Appellant, Agent Whitson read Appellant his *Miranda* rights again. During the time between the first statement and the polygraph examination, Appellant had "free run" of the building. The officers provided lunch for him. Appellant was in and out of the building making calls on his cell phone. Sometime between 4:00 and 6:00 p.m., Appellant told Detective Daniels he wanted to go home. Detective Daniels called Agent Whitson in Appellant's presence, and Agent Whitson said that Appellant was free to leave but asked if Appellant could stay ten more minutes because he was heading back to the CID Building. Detective Daniels relayed this information, and Appellant agreed to stay.

Appellant's friends, Deborah and Danny Chumley, came to visit Appellant at the CID building. The Chumleys knew Appellant and his wife through church. When the Chumleys arrived at the CID Building, Appellant was sitting outside of the building. There were no officers with him. They spoke with him. They asked Appellant if he could leave, and he replied that he could not leave because the officers had taken his clothes. The Chumleys were also told that Appellant was waiting for someone to come and perform a polygraph examination on Appellant. The Chumleys offered to get some clothes for him. The Chumleys said they were going to get something to eat. Agent Whitson asked Appellant if he would stick around because he had just spoken to Agent Elrod who was about forty-five minutes away. Agent Whitson asked Appellant several times if he wanted some clothes, and he asked Mr. Chumley after they returned from eating if he would go and get some clothes for Appellant. When the Chumleys returned with the clothes, Appellant was no longer outside, and they did not see him at that time. The Chumleys did not believe that Appellant was uncooperative or resisting the officers in any way. Mr. Chumley stated at the hearing that Appellant was free to leave and that he was going to leave with the Chumleys at one point when they were going to eat.

Agent Skip Elrod, the polygraph examiner, arrived around 7:45 p.m. When Agent Elrod arrived, he set up his polygraph instruments in another interview room. Agent Whitson advised Agent Elrod about the facts of the case and what he had found at the scene. Agent Elrod read Appellant's *Miranda* rights to him as well as, the polygraph warning. Appellant signed off on both. There was no objection or hesitancy on the part of Appellant nor did he ask for an attorney to be present. Agent Whitson was not actually in the room when the polygraph was administered but waited in the CID Building until the examination was completed. The polygraph examination lasted about two hours and fifty-five minutes. Around 9:40 p.m., during the time Agent Elrod was examining Appellant, Agent Whitson was in-

formed that officers found the victim's identification, checkbook and rings.

At the conclusion of the polygraph examination, Agent Elrod came out and told Agent Whitson that Appellant had admitted to killing his wife. About two or three minutes later, Agent Whitson went into the room to take a statement from Appellant who told him it would not take long to take the statement from him. Agent Elrod was not present during this statement. Agent Whitson took notes during the interview, wrote out the statement, read the statement to Appellant, and Appellant signed the statement. Agent Whitson did not re-advise Appellant of his *Miranda* rights before taking the statement. Appellant never requested an attorney but stated that he was tired.

Special Agent Skip Elrod was a witness at the suppression hearing. He is a polygraph examiner with the TBI. Agent Elrod met Agent Whitson to conduct a polygraph examination on Appellant on the afternoon of August 29, 2005. Agent Elrod was informed that Appellant had been at the police station all day, had not been interrogated up to that time, and was taking a break. He was also informed that Appellant had already given a statement. Agent Elrod first advised Appellant of his' *Miranda* rights. Appellant signed a waiver of his *Miranda* rights after Agent Elrod presented the form to him. Agent Whitson was in the room when Appellant signed the waiver. Appellant did not ask for a lawyer or anything else at the time he signed the waiver. Appellant also signed a polygraph consent form. At the beginning of the polygraph examination, Agent Elrod asked some test questions. These questions included whether Appellant had hit his wife, was Appellant present when his wife was hurt, and did Appellant plan with anyone to hurt his wife. The examination lasted a little over two hours. At the conclusion of the examination, Agent Elrod informed Appellant that he had concluded that Appellant was not being truthful. Appellant did not respond to this accusation. Agent Elrod then conducted a post-polygraph interview in which he told Appellant that he was not telling the truth and accused Appellant of knowing more information. Agent Whitson was not present for the post-polygraph interview. Appellant initially denied that he had hurt his wife during the post-polygraph interview but eventually admitted that he had killed his wife. Appellant became remorseful and started crying. Agent Elrod told Appellant that he should go out and speak with Agent Whitson and tell him the details. Appellant did speak with Agent Whitson and provided a statement.

Jeff Tyler is employed by the Walters State Campus Police. On August 29, 2005, he received a call from the Morristown police to locate Appellant's pick-up truck on the campus. Mr. Tyler found the truck in a public parking lot on campus.

Sergeant Chuck Letterman is an officer with the Morristown Police Department. On August 29, 2005, he was asked to locate Appellant's pick-up truck at Walters State Community College. The officers just sat and watched the vehicle. If someone had tried to drive off in it, Sergeant Letterman would have stopped them. The truck was not searched during the time that Sergeant Letterman was present.

### EVIDENCE AT TRIAL

Appellant's trial lasted six days. During the trial there was extensive testimony given and evidence provided to the jury concerning the day in question, as well as Appellant's relationship with the victim.

Heather Owens was a first grade teacher who worked with the victim, Janet Brock. She and Mrs. Brock were taking

classes together in order to earn their master's degrees. On August 28, 2005, Ms. Owens and Mrs. Brock spoke with each other on the telephone about 9:00 p.m. That telephone conversation was the last time Ms. Owens spoke with the victim.

J.D. Tolliver, the victim's father, testified at trial. At the time of the victim's death her children were four-and-a-half and nine months. On the day in question, Mr. Tolliver's day started as usual until he received a telephone call from Appellant, who was his son-in-law. Appellant informed Mr. Tolliver that he could not get in touch with his wife. After trying to reach the victim by telephone, Mr. Tolliver went over to her house. He entered the house and called his daughter's name three or four times. Mr. Tolliver entered the house through the back door, proceeded through the dining room, kitchen, and down the hall to the bedrooms. When he checked on his grandchildren, they were asleep in their beds. He proceeded to the victim's room and saw blood everywhere and his daughter sitting in the corner. The victim had blood all over her. Mr. Tolliver checked for a pulse and found none. He felt the victim and testified that she was pretty cold and the blood had dried slick. Mr. Tolliver got the telephone and called 911 at 6:43 a.m. The 911 operator called one of the victim's neighbors who came out of their house to help Mr. Tolliver get the children out of the house. Mr. Tolliver never called Appellant back to tell him what he had found. Shortly thereafter, emergency personnel began to arrive.

Up until the victim's murder, Mr. Tolliver had no reason to believe that Appellant would harm her. Mr. Tolliver and his wife had a good relationship with Appellant. Mr. Tolliver found nothing suspicious in Appellant's early morning telephone call to him.

Agent Elrod was the next witness at trial. He stated that he was called upon to conduct a polygraph examination of Appellant. He testified concerning the same information to which he testified in the hearing on the motion to suppress. Agent Elrod stated that before the interview began he asked Appellant how he was feeling physically. Appellant stated that he had gotten some sleep the night before and that even though the events of the day had taken some time, he was willing to sit and talk with Agent Elrod. As for the actual admission, Agent Elrod testified that Appellant told him that he had become upset with the victim when they were discussing buying a motorcycle, and Appellant got angry with her and struck her with a baseball bat. As stated above, Agent Elrod then informed Agent Whitson. Agent Whitson obtained a written statement from Appellant, for which Agent Elrod was not present.

Agent Whitson also testified at the trial. He stated that he is a criminal investigator with the TBI assigned to Union and Claiborne Counties as a field agent. At around 8:00 on the morning of August 29, 2005, Agent Whitson received a call from the Claiborne County 911 advising him that the detectives were at the scene of a dead body and requesting TBI assistance. Agent Whitson drove to the victim's house. He entered the house through the back door into the dining room. Detective Daniels was already there photographing the scene. Agent Whitson described the scene in the following manner:

I noticed there was blood on the floor, blood on the pantry wall and door, then as we walked into the living room, there was a drop of blood in the living room, and right off the living room down the hall, the next door to the right was the bathroom. There was blood smudged on the walls, a blood smudge on the

door, I think one on the dryer, and drops in the floor.

We went on down to the end of the hall. ... As I entered, Ms. Brock was sitting with her back up against the chest of drawers and the side wall, with her feet out.

....

Her head was slumped over. She had some type of—for lack of a better word—internal organ hanging out of her nose. She was covered in blood. There was hair, teeth and scalp down around her body. Beside the body against the wall was a very large blood splatter. Just above that was another large splatter, then there was blood splatter on the dresser, blood splatter on the walls, blood splatter on the ceiling. The bed was covered in blood. Hair beside the blood—beside the bed. And between the bed and the wall was another large splatter.

....

This is one of the more gruesome crime scenes that I had been on in my career, and at that point, I wanted to have the detectives back out and have the Violent Crime Response Team come and process the scene.

The largest amount of blood was around Mrs. Brock's body. Agent Whitson added that none of the doors or windows appeared to have been forced open. There was also no evidence of a break-in because the house was fairly neat. Agent Whitson next stated that Appellant arrived in the patrol car, and Agent Whitson described his encounter with Appellant as he had testified in the hearing on the motion to suppress. When Agent Whitson was in the patrol car he told Appellant that his wife "didn't make it." Agent Whitson explained to Appellant that Mrs. Brock was dead. Appellant put his head in his hands and appeared to cry, but Agent Whitson

noticed there were no tears. This was "the first red flag" for him. Agent Whitson testified that Appellant signed forms for permission to search Appellant's residence and car after Agent Whitson told him that Mrs. Brock was dead. Agent Whitson felt that the urgency of the situation required getting consent to search from Appellant rather than waiting for a search warrant. When Agent Whitson was in the patrol car with Appellant, he did not notice any blood on Appellant's clothing. Appellant subsequently agreed to go to the CID Building to make a statement. As stated above, Appellant gave Agent Whitson his clothes. While Appellant changed his clothes, Agent Whitson observed that Appellant did not have any bruises or marks on his body. Appellant did have a small cut on his finger. Agent Whitson did not believe that he had any reason to arrest Appellant at this time, but he was suspicious. Appellant was given an orange jail uniform and orange flip flops for clothing. Appellant was asked more than once if he needed to go anywhere, and he replied that he did not need to go anywhere. Agent Whitson also took a buccal swab, a Q-tip run along the inside of the mouth, for purposes of obtaining Appellant's DNA for testing. Agent Whitson also asked to take Appellant's fingerprints. He also agreed to that. Agent Whitson also stated that the items recovered from Appellant's truck were sent for DNA testing on June 7, 2006, and tested negative for both the victim's and Appellant's DNA.

Deborah and Danny Chumley came to visit Appellant while he was waiting for Agent Elrod. Agent Whitson saw Appellant walking to the car with the Chumleys to go get something to eat. Agent Whitson told Appellant that Agent Elrod was almost to the CID Building and asked Appellant if he would wait. Appellant

stated that he did not mind waiting and came back to the building. The Chumleys left.

Agent Whitson stated that Appellant signed a *Miranda* rights waiver read to him by Agent Elrod before the polygraph examination. As stated above, Appellant confessed to the murder during the polygraph examination. Appellant gave a written statement to Agent Whitson following the polygraph examination. The statement read as follows:

> This is the second written statement given to TBI agent, James Whitson, by Jamie Brock on August 29th, 2005. I gave one statement to you today, but I was afraid when I talked to you. I didn't tell the whole truth. I told you I didn't kill my wife. We had been having some problems with each other, nothing major, just little problems that built up.
>
> This morning when I got up, Janet started on me because I wanted to buy a motorcycle and ride to work. I got so mad I put my clothes on and went outside and let the dog out. The kitchen light glared off the metal baseball bat in the yard. I grabbed the bat and went inside. I put on a mask and went to the bedroom. Janet said, hey, and I hit her. I don't remember how many times I hit her, I just hit her. When I stopped, her body was lying against the wall. And the dresser.
>
> I grabbed her wallet and jewelry and tried to make it look like someone broke in and robbed and killed her. I rode my bike through the yard to leave a track. I wanted you to think someone stole my bike and rode off. When I left I threw the bat out of the truck window over the cab. I don't remember where, but it was on the road that I live on. I put the bike in the ditch and I changed clothes before I left the house. I had the

> clothes in a bag and I threw them in the river before you get to Clinch Mountain.
>
> I left the items I took in the truck. I forgot about them and—I left the items I took in the truck. I forgot about them and left them wrapped up in an old jacket under the seat.
>
> I didn't plan to do this to Janet, it just happened this morning. I'm sorry I did this. I don't know what come [sic] over me. After I left, I turned around and went back to my house. I wanted to check on my children. I wanted to make sure they weren't awake and make sure they didn't see anything. I peeked in their room and they seemed like they were asleep. I left and went to work.
>
> This statement is true and accurate to the best of my knowledge. Signed Jamie Brock.

Agent Whitson testified that he later recovered the bat and the bicycle, as well as the victim's jewelry, wallet and a black jacket.

Agent Whitson also collected oral swabs from the victim's children for DNA testing. Also as part of his investigation, Agent Whitson had another officer attempt to collect video surveillance tapes from Catdaddy's store where Appellant claimed he stopped for coffee between 4:00 and 5:00 a.m. the morning of the killing. However, there was no video available. Agent Whitson also had an officer collect the video surveillance tape from Walmart in Morristown where Appellant claimed to have stopped to use the bathroom the morning of the murder. There was video available, and it showed Appellant at Walmart around 5:30 a.m. Agent Whitson also subpoenaed the cell phone records of a Bambi Alford. At the time he was brought to the CID Building, Appellant had two cell phones. One of the cell phones was a number billed to Ms. Alford. With regard to the cell phone for which Ms. Alford

paid, Appellant told Agent Whitson that he did not use the cell phone but only kept it to play a game that was on the cell phone.

The medical examiner's office was informed by law enforcement that the victim was apparently killed by blunt force trauma to the head, possibly even gunshot wound trauma and that the body was found in the residence on the floor. The body was transferred the day of the murder. Dr. Darinka Mileusinic–Polchan completed the autopsy of the victim's body on August 30, 2005, the day after the murder. When Dr. Mileusinic–Polchan began her external examination she noted that the victim's body was covered with dried, matted blood. The victim's clothing was soaked with blood and there were "multiple pieces of tissue and scalp that were actually detached from—from the original position ... on the head." Dr. Mileusinic–Polchan noted that the victim's head was the area of the most severe trauma. Dr. Mileusinic–Polchan stated that the victim's head "was very bruised, very swollen, and the scalp was torn and shredded in multiple pieces. As a matter of fact, the shaving of the scalp was such that I could almost, without incision of the scalp, deflect the pieces of the scalp in—across the forehead and the back of the head." Because the scalp bleeds extensively, Dr. Mileusinic–Polchan stated, there would be a tremendous amount of blood lost. The victim's face was deformed because there were multiple fractures to the nasal bones, both jaws, and multiple teeth were dislodged from both jaws. Dr. Mileusinic–Polchan estimated that the victim's head, alone, had sustained 46 blows. On the victim's torso, Dr. Mileusinic–Polchan noted that there were multiple bruises that were consistent with blunt trauma. On the torso, Dr. Mileusinic–Polchan was better able to see the patterns left by the weapon. She stated that it was an object that was elongated and not too wide. She testified that it could have been anything from a bat to a rod. Dr. Mileusinic–Polchan estimated that the victim had received fifteen blows to her torso. Dr. Mileusinic–Polchan also noted multiple injuries to the victim's arms, specifically her forearms and hands. She described the wounds as classic defensive wounds. There were multiple bruises on the victim's arms, and she also sustained a fractured finger on both her right and left hands. The fingernails on the broken fingers had been broken off, and the bone was visible. Dr. Mileusinic–Polchan testified that the bone fragments crumbled when she was examining the body. Dr. Mileusinic–Polchan estimated that there were thirteen blows to the victim's arms and hands. Dr. Mileusinic–Polchan stated that the minimum number of total blows sustained by the victim on her entire body was 74.

Dr. Mileusinic–Polchan next testified regarding the internal examination of the victim. She started with the victim's head. Dr. Mileusinic–Polchan stated that pieces of the victim's scalp were detached or missing. "Whole chunks of scalp and hair fell out." Dr. Mileusinic–Polchan stated that some of the detached pieces were transported with the victim's body, and some were attached to the body in the dried blood. Dr. Mileusinic–Polchan described that the victim suffered various hemorrhages to the tissue in her head. In addition, the doctor stated that there had been additional hemorrhaging enveloping the victim's brain. The brain itself also showed multiple bruises. After removing the victim's brain, Dr. Mileusinic–Polchan discovered that the base of the victim's skull had been shattered. This shattering included a tearing of the membrane which allows for communication between the brain and the nasal and oral cavity. Dr. Mileusinic–Polchan also concluded that there was a severe hinge fracture, which is typically caused by a severe lateral blow.

As part of the internal examination, Dr. Mileusinic–Polchan completed an examination of the victim's internal organs in part to help document the brain injury. Because of the above-described shattering of the base of the skull and the tearing of the membrane, the victim's blood drained from her brain into her stomach and into her lungs. The presence of blood in the lungs and the stomach is evidence that the victim lived for a certain amount of time after the injuries. Dr. Mileusinic–Polchan was shown the bat found near the victim's house at the trial. Dr. Mileusinic–Polchan stated that the injuries sustained by the victim would correspond to the shape and size of the bat. She concluded that the cause of the victim's death was multiple blunt force injuries, including the head, torso and extremities. Dr. Mileusinic–Polchan also concluded that the victim's death was not instantaneous. Dr. Mileusinic–Polchan also stated that the victim would have been in constant pain between sustaining the injuries and her actual death.

Judy Miller testified at the trial. As she stated at the suppression hearing, Ms. Miller worked with her husband, Sonny Miller, and Appellant at the time of the murder. Ms. Miller had been in the victim's home two or three times a month since the victim and Appellant had moved into the home. There was a spare key left under the trash can on the back patio that Ms. Miller or the babysitter could use to get into the house when no one was home. Ms. Miller also identified her sister's wallet, jewelry and a basket the victim kept in her room. Ms. Miller described the same events on the day of the murder at trial that are set out above from the suppression hearing. Ms. Miller stayed at her sister's home until emergency personnel removed the body. A few days after the day of the murder, Ms. Miller was in her sister's home. She noticed that the victim's purse was on the dining room table and contained the victim's keys to her cars and the home. Ms. Miller did not notice any signs of a break-in. Ms. Miller stated that Appellant was excited when his first child was born, but Ms. Miller did not believe that Appellant was excited about his second child's birth. She stated that Appellant did not do much to help the victim take care of their second child. Several days after the murder, Ms. Miller and other family members cleaned up the master bedroom in the victim's home. Ms. Miller also took the victim's laptop, as well as the children's clothes and toys. Because she found a password on a piece of paper, Ms. Miller was able to access the victim's e-mail account.

Sonny Miller, Mrs. Miller's husband and brother-in-law of the victim, also testified at the trial. Mr. Miller stated that he currently works at Breeding Insulation and worked there with Appellant at the time of the victim's murder. On the day of the murder, he and Appellant began their morning at Walters State Community College. Mr. Miller arrived at Walters State around 6:00 a.m. and found Appellant in the parking lot standing next to his truck. Mr. Miller and Appellant went to the worksite. Appellant told Mr. Miller that he had been trying to call the victim, but she was not answering the telephone. Mr. Miller showed Appellant what to do at Walters State and left around 7:00 a.m. to go to another work site. After arriving at the second location, Mr. Miller received a telephone call from his wife. She informed him that someone had broken into the victim's house, and the victim was "gone." As a result of the telephone call, Mr. Miller went to Walters State and called Appellant to ask him to meet Mr. Miller outside. Mr. Miller told Appellant to get in his car and leave his truck at the parking lot. Mr. Miller stated that he did not want Appellant driving because Appellant

might be worried about his family. Mr. Miller began to drive toward the victim's house. Along the way, Appellant asked Mr. Miller to stop at a gas station in Bean Station. Appellant got out and went into the bathroom. When he returned, Appellant's face, arms, and shirt were wet. When they arrived in Tazewell, an officer pulled over the car in a parking lot. Mr. Miller approached the police car and the officer told him to keep driving because the officer was going to escort them to the victim's house. The officer stopped Mr. Miller again. Mr. Miller was becoming increasingly concerned about his family, so he jumped out of his car and approached the officer. The officer met him between the two cars and informed Mr. Miller that he would have to escort Appellant to the victim's house in the patrol car. Mr. Miller did not remember the officer patting Appellant down or reading something off of a piece of paper to Appellant. Mr. Miller remembered the officer sitting Appellant in the car, and he also saw the officer take something out of his pocket. He saw the officer stand and talk to the Appellant after he took something out of his pocket. After Appellant got into the police car, Mr. Miller drove directly to the victim's house. When he arrived, there were several police officers on the scene. The victim's house and yard had been taped off by the police. Many family members were outside the house. Mr. Miller also identified a brown camouflage jacket that he had seen Appellant wear. Mr. Miller stated that as far as he knew Appellant and the victim had a good relationship. However, he also admitted that he did not know that Appellant stopped to see Bambi Alford before coming to work.

Patrick Vaught is a patrol officer with the Morristown City Police Department. Around 8:50 a.m., on the morning of the murder, Officer Vaught was dispatched to find a white Toyota pick-up truck on the Walters State campus. He located the truck in a parking lot. Officer Vaught notified dispatch that he had located the truck. Officer Vaught did not notice any blood on the outside of the truck. He did not try to gain access to the truck. He was joined by Officer Jeff Tyler, with the Walters State campus police, and Lieutenant Chuck Letterman, with the Morristown Police Department. Officers Vaught and Tyler walked around in an attempt to locate the driver of the vehicle. They were told that the driver of the truck had left with his supervisor. While they were gone, Lieutenant Letterman remained with the truck. After he returned from looking for the driver, Lieutenant Letterman sent Officer Vaught back to work. Lieutenant Letterman and Officer Tyler remained with truck until officers with the Claiborne County Sheriff's Office arrived. While Officers Vaught and Tyler and Lieutenant Letterman watched the truck, no one was around it, no one attempted to enter it, and no one got inside it.

Officer Harrison Cornett was a detective with the Claiborne County Sheriff's Department on the date of the murder. He received a call that Appellant's truck had been located at Walters State Community College. At that time, he and Sergeant Steve Cline left the scene to go to Walters State. When they arrived, they found Officer Tyler and Lieutenant Letterman watching the truck. Detective Cornett and Sergeant Cline walked around the truck and noticed it was locked. They did not see any blood on the truck. Detective Cornett looked through the window and saw a camouflage jacket tied in a knot on the floorboard. Detective Cornett had Bud West tow the vehicle to Tazewell. Detective Cornett followed the truck to town and secured the truck in Mr. West's shop. Detective Cornett left the shop and later returned with a TBI forensic team

around 9:00 p.m. The garage was unlocked, and the New Tazewell Police Department unlocked the vehicle. During the search of the truck, law enforcement found a camouflage jacket. When the jacket was unraveled, Detective Cornett found the victim's driver's license, credit cards and a small basket with her wedding ring set and earrings, as well as a house key in a sandwich bag, wrapped up inside the jacket. Detective Cornett turned the items over to Agent Whitson.

Steve Murphy is a life-long resident of Claiborne County. He is a constable of the area includes the victim's house. On the morning of the murder, his mother called him to ask what was happening at the victim's house. Constable Murphy went to the scene and spoke with family and friends of the victim. At the direction of TBI agents, Mr. Murphy gathered contact information from the neighbors. While he was collecting the information, Constable Murphy found a piece of paper next to the road that appeared to have blood on it. He went to notify some other officers. When he returned with the officers, one of the officers located a bat approximately twenty feet from the road in a field. The TBI was notified and arrived on the scene. Constable Murphy remained on the scene and watched the piece of paper and the bat until the TBI arrived. Once the TBI arrived, they videotaped and photographed the area and collected the evidence.

Sillus Leach lived near the victim's house. About 9:00 a.m., on the morning of the murder, Mr. Leach was taking his usual morning walk. On his way back home, he saw a bicycle on the side of the road. Mr. Leach retrieved the bicycle and returned home. After he arrived home, Mr. Leach squirted water on the front of the bicycle with a hose. He saw something brown that he thought might be blood coming off of the bicycle. He stopped spraying the bicycle and wiped it off with a paper towel. He was sure it was blood after wiping it off with the paper towel. Around 12:30 or 1:00 p.m., he called the Claiborne County Sheriff's Office because his wife told him that there had been a murder in the subdivision that morning. The officers arrived and took the paper towel, the clothes Mr. Leach had on when he was washing off the bicycle, and a DNA swab. The officers also took the bicycle with them when they left.

Agent Andy Corbitt is assigned to Knox and Anderson Counties as a field agent for the TBI. He arrived at the scene around 10:00 a.m. the morning of the murder. He did not enter the residence but instead began a neighborhood canvas in an attempt to identify any witnesses. While he was completing the neighborhood canvas, an officer came to Agent Corbitt and told him that he wanted to show him something. The officer took Agent Corbitt to a ditch line and pointed out a piece of paper and a baseball bat. Agent Corbitt began interviewing the individual who had found the piece of paper and the bat. While he was doing so, he was told by another officer that a bicycle had been found. Agent Corbitt proceeded to Mr. Leach's house. He had Mr. Leach show him the location in which the bicycle was found. Agent Corbitt found a ripped photograph in the area where Mr. Leach found the bicycle. Agent Corbitt took the bicycle and put it in the back of his car.

Denise Morrissey is a crime scene team leader for crime scene processing with the TBI. She processed the scene of Janet Brock's murder. On the way to the residence, an officer stopped the team and directed them to items found in a field. The team observed the piece of paper and the bat. They proceeded to the house.

Agent Morrissey looked under a garbage can on the back porch for a hidden key. She entered the house and did an initial walk-through. Agent Morrissey saw no evidence of a forced entry. She saw blood on the back screen door and drops of blood in the kitchen and pantry. Agent Morrissey noted that everything looked normal. There was no sign of a struggle. She noted that there was a great deal of blood in the room where the body was discovered, but the blood was only in one-half of the room.

After the initial walk-through, Agent Morrissey returned to her team and described the scene. The team went inside to lay down evidence markers. At trial, Agent Morrissey identified photographs from the scene that showed the marker numbers. Agent Morrissey identified a photograph of the bat. TBI agents presume that reddish brown stain, known as RBS, is blood during an investigation of a crime scene. Agent Morrissey took samples of RBS throughout the victim's house. These areas included: the back screen door; the kitchen; the kitchen floor; the kitchen countertop; the pantry door; several boxes of food inside the pantry; the area leading from the kitchen to the living room; the bathroom door and wall adjacent to it; the bathroom floor and cabinets; and the bathroom sink which contained diluted RBS. Agent Morrissey also photographed the contents of the clothes hamper. The agents discovered that the hamper contained wet clothes that were located under a dry layer of clothes.

In the bedroom, where the victim's body was found, Agent Morrissey collected a pillowcase, and RBS on the bed comforter. Agent Morrissey also photographed clumps of hair and skin on the bedroom floor. She photographed the victim's body so as to show the position in which the body was found. Agent Morrissey also photographed a line of reddish brown drops leading from the bed to the foot of the bed. On the wall next to the bed, Agent Morrissey photographed an RBS on the wall. She also photographed a large hole in the wall with blood spatter near where the body was found. Agent Morrissey also cut out pieces of carpet to be tested. She testified that the team took several pictures of the wall near the body because of the blood spatters and smears. Agent Morrissey stated that she took close-up pictures and organized them in a grid so that the agents could identify the location on the larger grid from which the close-up pictures were derived. Agent Morrissey also collected reddish brown spatter from the ceiling above the gridded area and about two feet out from the wall.

Agent Morrissey's team also searched Appellant's truck while it was at Bud's Wrecker Service. The truck was locked when the team arrived, and the local police department "popped" the locks. They searched for any possible blood evidence both inside and outside the truck. They found a flannel brownish jacket on the passenger-side floorboard that had been tied in several knots. When the agent untied it they found the victim's wallet, a bag with a key in it, and a little basket with some jewelry.

On cross-examination, Agent Morrissey stated that her team does not clean up crime scenes after they have completed their investigation. If there are any swabs taken, those stains might be wiped up, but the team does not clean the area. Agent Morrissey also stated that they did not swab or collect every RBS at the crime scene in question. They cannot collect every blood spatter or RBS, so the team focuses on taking a representative sample. She also stated that she did not know which evidence was tested from the scene. Agent Morrissey also stated that her team

did not collect the clumps of hair and skin on the floor because they were placed in the body bag with the victim. The team did not take fingerprints at the scene but did collect some items for the purpose of testing for latent fingerprints. Also on cross-examination, Agent Morrissey denied that Harrison Corbitt had retrieved the jacket and items from the floorboard of Appellant's truck. She stated that she retrieved the items and gave them to him. She stated that the team did not find any evidence of blood either inside or outside of the truck. About 5:00 p.m. the evening of the murder, the officers with Appellant requested a kit for a buccal swab to be used on Appellant. Agent Morrissey stated that there was a request to test the vehicles in the garage of Appellant's home. The initial test was negative for the presence of blood.

Stuart James is a consulting forensic scientist. He concentrates on bloodstain pattern analysis. He testified that in bloodstain pattern analysis the scientists look at the size, shape, and distribution of the pattern "to reconstruct the events that were responsible for the injuries that occurred. . . ." In the case at hand, Mr. James was provided with a videotape of the scene; an assortment of color photographs of the scene; diagrams of the scene; color photographs of the autopsy examination; color photographs of Appellant; reports generated by the TBI and the TBI Crime Laboratory; a written statement by Appellant; and a transcript of court proceedings on September 29, 2005.

Based upon his review of this evidence, Mr. James made the following findings:

First of all, we have in the bedroom, over in this corner by the dresser—we have the final position of the victim in the case, Janet Brock, and she is in somewhat of a seated position there.

My findings indicated that blows were struck in that final position to the victim, and that's based on my analysis of the spattered blood that is present on the wall behind her head, just above her head and also on her legs. There is an abundant amount of spatter which is present. Some of that spatter is clotted, and we haven't talked about clotted blood but normally, blood clots within three to 15 minutes, if you cut your finger or—as long as you're not taking Aspirin or some other medication that's gonna extend your clotting time. And I did see a fair amount of clotted blood on her legs which indicated to me that there was some time interval between blows struck in that position compared to where the whole event began, probably in general terms, at least three minutes, allowing for blood to clot in an area where a weapon then was struck again in that area to spatter the clots rather than just fluid blood, and that's pretty evident in the photographs.

Now, in addition to spattered blood being relevant to that position of Janet Brock, above that area on the wall at approximately her height, because I had measurements to indicate that, there's a large contact stain that has hair intermixed with it—would indicate to me that an injured person was actually almost in a standing position in that area and still at that point receiving blows prior to her final position. And that's accountable by the presence of the spatter on the wall at approximately a five to five foot, four inch height off the floor. So then we have two positions where activity took place.

Also, not far from that area of spatter on the wall is a damage impression in the wall which indicates that some object made contact with a force strong

enough to almost puncture the wall in that area.

Also, before we leave this area, in front of the body there are at least two circular bloodstain transfer patterns which, according to reports and my observations, appeared to be about the same size as the end of a softball bat.

Now, going further back toward the bed, there is evidence of contact with the—with the blinds on the window while the person bleeding was in a—you know, at least almost a standing position, certainly not on the floor because of the height of these transfer patterns, and that would be this window here. And then over on the wall opposite the—what we would call the head of the bed, there's another large contact pattern transfer on the wall which consisted, by its height with the head of an injured person that's bleeding, with what I think is probably more expirated blood from the nose and mouth. There's a pattern of it right next to that transfer pattern.

So, we're kind of going in a backward direction to where this—the bloodshed actually began in this case, and that would lead me over to the top of the bed. There's a large amount, in probably several areas as I recall, of saturated blood on the top bedding. And this would indicate to me that a bleeding person was on the bed for a period of time. I don't see any spatter in the photographs, but certainly, the amount of saturated blood on the bed would indicate a—without giving you a blood volume—a significant amount of bleeding occurring on the bed before Janet Brock was able to get out of the bed, and of course, then she was able to—there's no evidence of dragging the person, and the fact that the evidence—the blood evidence shows that she was—you know, the victim was—or the bleeding

person was probably in a standing position, able to move down to her final position where other blows were struck. So, that's pretty much it.

. . . .

Well, I can say where bloodshed began which was on the bed.

. . . .

Now, one more thing I—to interject here. This is actually spattered blood on the wall, but there is some castoff. Remember, I talked about the swinging of an object? I forgot to mention—on the ceiling above this area where the victim is, on the ceiling there are a couple of castoff stains from a swinging object.

Melanie Carlisle is an agent with the TBI. She does blood alcohol analysis, toxicology analysis, and she is a member of the Violent Crime Response Team. She was at the crime scene in question with Agent Morrissey in charge of the team. Agent Carlisle was responsible for taking video outside the victim's residence. She collected a piece of paper with RBS. She did not take fingerprints or footprints because that was not her assignment.

Stephanie Dotson was another member of the Violent Crime Response Team led by Agent Morrissey who responded to the crime scene. Agent Dotson was responsible for sketching the crime scene, especially inside and around the outside of the house. She also assisted in collecting evidence and taking measurements and documenting the location of certain pieces of evidence. Agent Dotson also inventoried a purse that was laying on the kitchen table. It contained two $20 bills in a bank envelope, two car keys and other various items. There were two vehicles in the garage. The purse was on the table right in front of the door leading from outside, into the

house. The TBI agents did not take the purse as evidence.

Jacob White is another agent with the TBI. He is a member of the Violent Crime Response Team. He responded to the crime scene and was responsible for photographing and measuring evidence markers in relationship to the scene and each other. He also collected a small aluminum bat as evidence. Agent White found the bat in a grassy area near the home. The bat was small, black and heavily-dented. There was spider-cracking of the finish in the lower recesses of the dents in the bat. There were also reddish brown stains on the bat, as well as, hair. Agent White collected the bat, packaged it to preserve it, and turned it over to his team leader, Agent Morrissey.

Linda Littlejohn is a forensic scientist with the TBI Crime Laboratory. She is assigned to the microanalysis section. In this case, Ms. Littlejohn compared a circular pattern on a piece of carpet with the bat found near the victim's hose. Ms. Littlejohn concluded that the pattern was consistent with the end of the bat.

Chad Johnson is a forensic scientist with the serology unit at the TBI crime laboratory. As part of this investigation, Mr. Johnson took blood samples from the bat found near the victim's home. He discovered that the blood on the bat matched that of the victim. Mr. Johnson also tested a piece of paper that was found near the side of the road. He tested a reddish brown stain on the paper which turned out to be blood. When he completed a DNA analysis on the blood stain, he found that it matched that of the victim. Agent Johnson also tested blood found on the bicycle which was found near the victim's home. This blood also matched that of the victim.

Agent Johnson tested several other blood samples found throughout the victim's house. These tested positive for being the blood of the victim. Two samples, a piece of paper from the kitchen floor and a swab taken from the bathroom sink, were tested. The results showed that the samples were a mixture of blood from the victim and one of her sons. Other pieces of evidence, such as towels from the hamper, were tested, but Agent Johnson was unable to draw any conclusions with regard to these samples because the DNA was too degraded or insufficient to test. Agent Johnson also was responsible for testing Appellant's clothes and shoes. Agent Johnson found no evidence of blood stains on these items.

Darren Shockey is also an agent with the TBI. At the time of the investigation into the victim's murder, he was responsible for latent print examination. Agent Shockey analyzed the bicycle taken in connection with this case. He found no latent prints whatsoever. Agent Shockey also analyzed a piece of paper found near the bat for latent prints. He failed to find any ridges which are conducive to a latent print. Agent Shockey was also unsuccessful when he tested the bat for latent prints.

Steve Cline was a sergeant with the Claiborne County Sheriff's Office at the time of the incident. On August 30, 2005, he went to the Clinch River to attempt to find a bag of clothes because the TBI informed him that Appellant admitted to throwing clothes in the Clinch River. Sergeant Cline worked with the Rescue Squad with boats to look for the clothing. The officers found nothing.

Bambi Alford[1] testified at the trial. She stated that she met the victim at the

1. At the time of the trial, the witnesses' name had been changed to Bambi Alford Williams. We will refer to her as Ms. Alford for clarity.

school her daughter attended. She also came into contact with Appellant and the victim at their church. When she and Appellant first met, they were just friends. Eventually, however, they began an intimate relationship. They had been engaging in the adulterous relationship for a few months prior to the murder of the victim. She stated that she and Appellant would meet mostly before work when Appellant would come to her house in the mornings, usually between 4:00 a.m. and 4:30 a.m. Some weeks he would come over five times a week. Other weeks it would be less than that. Ms. Alford stated that she would give him coffee and pack his lunch when he would come to her house in the morning. Ms. Alford also stated that she and Appellant sometimes met out of town, as Knoxville, Morristown, or Pigeon Forge. She stated that she purchased a cell phone for Appellant so that they would have more opportunities to talk. One reason she purchased the phone for Appellant was so they could keep their conversations private and secret from his wife. Occasionally, during the relationship, Appellant would complain about his wife to Ms. Alford. He told her that his wife wanted him to work all the time and did not want him to spend anything. Appellant did not specifically discuss leaving his wife to be with Ms. Alford, but he did tell Ms. Alford that he wanted the divorce to be his wife's idea. One day he told Ms. Alford that he had "just about had it." Appellant told Ms. Alford that he was interested in buying a motorcycle, but his wife did not want him to buy one.

Ms. Alford stated that the morning of the murder, Appellant spoke with her starting at about 4:00 a.m. She spoke with him several times that morning up until around 6:00 a.m. Around 5:00 a.m. he told Ms. Alford that he was going to try to call his wife. Appellant did not come over that morning. Ms. Alford had company.

Around 2:30 p.m. Appellant sent a text message to her telling her not to send him any messages. She did not know where Appellant was when he sent the message. Ms. Alford testified that Appellant was never violent with her.

Greta Williams is Bambi Alford's cousin. She stayed with Ms. Alford for a month to baby-sit Ms. Alford's children while she was at work. She did not have a bedroom and slept on the couch. She testified that Appellant would come to Ms. Alford's house Monday through Friday around 4:00 a.m. in the morning. He would stay for about forty minutes. Ms. Alford and Appellant would go to Ms. Alford's bedroom after he arrived. Ms. Williams assumed that the two were having intercourse based upon moaning she heard by Ms. Alford. Ms. Alford would fix food for Appellant and give it to him to take to work when he left. Ms. Williams testified that Ms. Alford and Appellant would communicate by cell phones and text messaging. Ms. Alford identified Appellant on the cell phone with the initials "MB" which stood for "My Baby." Ms. Alford showed some text messages from Appellant to Ms. Williams. The messages said "I love you."

Following its presentation of these witnesses, the State then rested its case. Appellant also put on extensive proof.

Christine Baker was a neighbor of Appellant and the victim. When the couple moved to the neighborhood they did not have children. After the children were born, she saw Appellant and the victim play outside with their children. She never saw Appellant show any signs of anger or frustration. She never heard Appellant complain of anything. On the evening of August 28, 2005, the night before the murder, Ms. Baker left her house to go to a friend's house. She saw Appellant outside

playing with his children, and the victim watching them from the porch.

Mr. David King is a contractor. He spoke on the telephone with Appellant concerning an addition Appellant wanted to add on to the house. Mr. King never met Appellant and did not discuss anything other than the house with him.

Ben Baker is a cousin of Appellant. He grew up in Kentucky with Appellant. Mr. Baker works in construction. In July of 2005, Mr. Baker and Appellant reconnected at a family reunion. Shortly thereafter, Appellant met with Mr. Baker so Mr. Baker could look over some plans for an addition that Appellant had. Mr. Baker also went to the house and made suggestions in connection with the plans. Mr. Baker also testified that he was close to his cousin, but he did not know that Appellant was involved in an adulterous relationship with Ms. Alford.

Detective David Daniels, who previously testified for the State, was called by Appellant. He testified that when he entered the victim's house he went from the kitchen through the living room and into the bedroom. When he came into the bedroom, he noticed a large amount of blood and the victim's body in the corner. He retrieved his camera from his car and began taking pictures. After taking pictures, Detective Daniels removed everyone from the house. He had previously requested one of his officers to call TBI. When Appellant arrived at the house, Detective Daniels and Agent Whitson went to the CID Building. Detective Daniels drove separately from Agent Whitson. Appellant was taken to the CID Building in a marked cruiser. Appellant was not read his rights at the time he was brought to the CID Building. Detective Daniels was under the impression that Appellant had been read his rights when Agent Whitson spoke with him earlier in the morning. Detective Daniels sat in the room while Agent Whitson spoke with Appellant. The room was known as the interrogation room, and there was a sign on the door to the room which read, "Interrogation Room." Detective Daniels was present during Agent Whitson's initial questioning of Appellant, and he signed the statement produced as a result of the questioning. Appellant was not formally under arrest by either Agent Whitson or himself at that time. Agent Whitson asked Appellant if he could have Appellant's clothes, and Appellant agreed. Appellant was given orange pants, an orange scrub shirt and flip-flops to wear. Appellant agreed to sign a release form for financial and medical records. Appellant also signed an autopsy order as next-of-kin. Agent Whitson left the CID Building. Detective Daniels stayed while Agent Whitson was gone because it was his job to stay with Appellant. Appellant had some visitors, and Appellant indicated that he wanted to leave. Detective Daniels called Agent Whitson, who told Detective Daniels to tell Appellant that he was free to leave, but Agent Whitson asked Detective Daniels to "see if [Appellant] would mind just to hang around for a few minutes" because Agent Whitson was on his way back to the CID Building. Detective Daniels was not present when Appellant spoke with Agent Elrod or Agent Whitson during the second questioning. After August 29th, Detective Daniels went to the Clinch River with Cathy Human, but they did not find any clothes.

Chris Massengill is employed by Verizon Wireless. He testified regarding the telephone records of the cell phones owned by Appellant and Ms. Alford for which Ms. Alford paid the bill. Mr. Massengill identified the location of the cell phone towers so that Appellant's approximate location at the time of certain calls could be traced

through the location of the towers. The first call was through the Harrogate, Tennessee Tower at 4:06 a.m. The next call was through the Tazewell, Tennessee Tower at 4:42 a.m. There are several more calls made through different towers throughout the morning. On cross-examination, Mr. Massengill confirmed that there were twenty-one calls and text-messages between Appellant and Ms. Alford between 4:00 a.m. and 9:00 a.m. on the morning that the victim was murdered. He also confirmed that Appellant called or sent a text-message to Ms. Alford thirteen times between 9:00 a.m. and 11:00 p.m. the day before the murder. Mr. Massengill also read some of the text messages between Appellant and Ms. Alford into the record. On August 25, 2005, one exchange between Appellant and Ms. Alford consisted of the following, "[Ms. Alford]: Outlaws gone yet? [Appellant]: Yeah. I feel free. [Ms. Alford]: Cool. You practically are."

Arthur Jerry Richards, formerly with the Federal Bureau of Investigation and deputy director for the Appalachian HEIDA, a federally funded drug program, is a private investigator hired by Appellant. On September 13, 2005, he went to the victim's home and took photographs of the house. He observed blood on the back porch, on glass on an inverted garbage can top adjacent to the porch, and on the floor of the master bedroom, as well as, on the mattress in the master bedroom. The carpet and bed in the master bedroom had been removed at the time Mr. Richards investigated the house. He did not find blood anywhere else in the house. Mr. Richards also drove from the victim's home to Walters State Community College stopping at Catdaddy's Market in Tazewell and Walmart in Hamblen County. The mileage was 52.3 miles and took approximately an hour and eight minutes. He also took photographs of various cell phone towers along the way. Mr. Richards also

retrieved a set of blueprints from Appellant's truck at Bud's Wrecker Service in Tazewell.

On cross-examination, Mr. Richards testified that he knew Agent Whitson from before his retirement and found him to be a professional and truthful investigator. When he drove from the house to Walters State Community College he drove within the speed limit and admitted if a person had exceeded the speed limit the drive time would have been shorter. On redirect, he testified that he did not know whether Appellant exceeded the speed limit.

Mr. Roger Poore is the owner of Catdaddy's Market in Tazewell. He testified that he also works at the market. He brought the register tape from August 29, 2005, the date in question. He verified that Jan Jefferson was working at the market from midnight until 8:00 a.m. on August 29, 2005. He verified a transaction at 4:38 a.m. After the date in question, law enforcement officers approached Mr. Poore to get the surveillance tape from the store, but it was not working on that particular date. On cross-examination, Mr. Poore testified that Catdaddy's sells approximately 310 cups of coffee every morning. Mr. Poore could not identify Appellant, nor could he verify that Appellant had ever been in his store.

Jan Jefferson also testified at Appellant's trial. She was working at Catdaddy's Market on August 29, 2005. She stated that she worked from 3:00 a.m. to 8:00 a.m. on the morning of August 29, 2005. If someone had a particular aluminum coffee mug, and they purchased coffee, the cost would have been fifty-four cents with tax. She did not know Appellant, nor could she positively state that he walked into the store on the date in question. She

identified a transaction from the register tape at 4:38 a.m.

Stacy Ryan Kinsler works for Cingular Wireless. He was designated a records custodian for the company for purposes of Appellant's trial. He testified regarding Appellant's cell phone records. In August of 2005, the first call of the day for the 15th, 16th, 17th, 18th, 24th, 25th, and 26th, was made around 5:00 a.m. to 423–489–9272, the victim's cell phone number. On August 29th, Appellant called the same number from 5:00 a.m. to 6:26 a.m. At 6:28 a.m., Appellant called 865–546–3142, the Tolliver's telephone number. At 6:30 a.m., Appellant called 869–8265. At 5:05 p.m., Appellant called 423–289–9293 and the call lasted for forty-seven minutes.

Rick Davis is a detective with the Claiborne County Sheriff's Department. He once again testified that he responded to a 911 call at the victim's house. He stated that one other law enforcement officer, Robert Chadwell, was present, as well as two ambulance personnel. He also saw the victim's father with one of the children in his arms. The other child was still in his bed. He entered the house and proceeded to the bedroom. Detective Daniels soon arrived. He admitted that they were trying to locate Appellant's vehicle. But, Detective Davis did not recall stating that with as much blood as was in the house, there would be a lot of blood in the vehicle. Detective Davis stated that they wanted to locate the truck not only for the truck itself but also to locate Appellant. On cross-examination, Detective Davis stated that had he known there were wet towels in the hamper, his opinion as to whether the truck contained blood would have been greatly different. He would have suspected that the person who killed the victim had cleaned up before leaving the house. He did check the answering machine at the house that morning, but he did not hear any male voices checking on the victim.

Officer Jimmy Seals also testified during Appellant's proof. Sergeant Cline and Detective Cornett advised Officer Seals of the car in which Appellant was riding. He pulled out behind the vehicle. The vehicle had on its flashers. Constable Howard Walker mistakenly activated his lights and pulled the vehicle over. However, Officer Seals had been told merely to escort the car to the scene. Subsequent to this mistaken light activation, Officer Seals resumed following the vehicle, and they proceeded toward the scene. A short time later, Sergeant Cline advised Officer Seals to stop the car. Officer Seals spoke with the driver of the car and told him that he needed to speak with Appellant. Appellant came back to Officer Seals's patrol car on the passenger side. Officer Seals advised Appellant of his *Miranda* rights, told Appellant that he was going to escort him to the scene, and patted him down. Appellant sat down in the backseat of the patrol car, and Officer Seals closed the door. Officer Seals took Appellant's two cell phones and a can of tobacco. He placed them on the front seat of the police cruiser. When they arrived at the scene, Officer Seals backed into the area where he parked because there were many people there. When they arrived, Agent Whitson came over to the cruiser. He had papers with him, and he opened the door and got into the backseat with Appellant. After Agent Whitson finished talking to Appellant, Officer Seals was instructed to take Appellant to the CID Building. Agent Whitson arrived at the CID Building shortly after them. On cross-examination, Officer Seals testified that Appellant did not object to his taking him to the scene and that the travel time to the scene was about eight minutes. During this time, Appellant was not handcuffed or shackled. Appellant never asked to get out of the

car. He also did not object to being taken to the CID Building.

Sergeant Robert Chadwell was working the night shift from 7:00 p.m. to 7:00 a.m. on the evening of August 28 and the early morning of August 29, 2005. He arrived at the victim's house in response to a 911 call. When he arrived, the victim's father was standing in front of the house with a small child. Sergeant Chadwell was the first law enforcement officer in the house that day. He found Mrs. Brock in the corner of the bedroom covered by a bedspread. Sergeant Chadwell pulled the bedspread off of the victim. Later that morning, Sergeant Chadwell saw Appellant in the back of Officer Seals's police cruiser. He witnessed Appellant signing the consent forms presented by Agent Whitson. Sergeant Chadwell accompanied Officer Seals when he took Appellant to the CID Building. Sergeant Chadwell testified that Appellant asked about his children and appeared upset. Sergeant Chadwell could not remember whether Appellant remained in the patrol car while they waited for Agent Whitson. On cross-examination, Sergeant Chadwell testified that the victim's father was an emotional wreck. The victim's father had put the quilt over the victim so that the children would not see her in that condition.

Ronald Steven Jones is a loss prevention security agent with Walmart in Morristown, Tennessee. Harrison Cornett retrieved the Walmart surveillance video for the morning of August 29, 2005, from Mr. Jones. Appellant's attorney played the surveillance video while Mr. Jones narrated from the stand. The video shows a white pick-up truck pulling up to the grocery-side doors. Mr. Jones testified that those doors usually open up at 6:00 a.m. A white male with jeans and a white t-shirt entered the store. The correct time as stated on the video was 5:23 a.m. The male exited the store on the same side, but through a different door. On cross-examination, Mr. Jones testified that the individual was in the store approximately ten minutes. He also stated that the bathrooms are located closer to the GM entrance as opposed to the grocery entrance.

Bill Baumgardner is a deputy with the Claiborne County Sheriff's Department. He discovered a ball bat outside the victim's house the morning of the murder. He also saw the piece of paper associated with the bat. He had Constable Steve Murphy stay with the paper and the bat while he got a TBI agent to come to see the items.

Joseph Stacy volunteers with the Claiborne County Rescue Squad. On August 30, 2005, he went to the river at the county line between Grainger and Claiborne Counties to assist the Claiborne County Sheriff's Department in locating a bag of clothes. The team consisted of three men. They had two drag boats, and they dragged the river to look for anything of evidentiary value. They were unsuccessful. They also searched about one mile down river. They searched for approximately four hours. Officer Cline did a field test where he threw a bag of clothes off of the bridge. The bag floated. They did not retrieve the bag from the field test.

Judy Epperson is the Jail Administrator for the Claiborne County Sheriff's Department. She testified that the inmates of the jail wore an orange uniform in August of 2005.

Appellant also testified on his own behalf. Appellant stated that he and the victim married June 24, 1995. They lived in Appellant's grandmother's house in Kentucky until January of 1996 or 1997 when they moved into the house which was the scene of the murder. They moved to be closer to the victim's family. The victim's parents treated him like he was one

of their own children. He also had good relationships with the victim's brother and sister. He never had any problems with her family. Shortly after they got married, Appellant went to work for his wife's brother-in-law at Breeding Insulation. At some point, he left that job for a job in the electrical department of Clayton Mobile Homes. He worked there for six years until he was terminated for using tobacco in the plant against company policy. Subsequently, he returned to Breeding Insulation where he worked until the day of the victim's murder.

The victim worked for Mike Campbell Insurance Agency for thirteen years. She returned to college to get a teaching degree and, after receiving her teaching certificate, she got a teaching job at Powell Valley Elementary. She taught computer. About three months after they began dating, the victim took over managing Appellant's financial affairs. She continued to manage the finances after the couple married.

The couple had two children, Jonah and Jarrett. When Jonah was born, he drove the victim to the hospital and stayed in the operating room when Jonah was delivered by C-section. He was also very active in Jonah's sports activities when Jonah was old enough to participate. Appellant also testified that he was very happy when Jarrett was born. Appellant believed that the victim was a wonderful mother. He also believed that the victim thought he was a good father. After the birth of Jarrett, the couple wanted to add on to the house to have more room.

On the day before the murder, Appellant took his older son to the park to ride their bicycles, where he saw Bambi Alford. They had not planned to meet at the park that day. After the park, Appellant returned home and put his bicycle in the garage. He spoke with his neighbors and played with his children while he cooked beef tips on the grill.

Appellant admitted that he knew Bambi Alford. He met her at Victory Worship Center where he and the victim attended church. Initially he and Ms. Alford were just friends. However, about nine or ten months after they met they had more opportunities to see one another. Ms. Alford gave Appellant a cell phone that she was not using. Appellant began to call her on that telephone. They used the cell phones to keep their relationship a secret. During their relationship, Appellant and Ms. Alford met in Knoxville, Pigeon Forge and other locations in the state. Appellant admitted that he would get up at 3:50 a.m. every morning to get ready leave for work. He left for work the same time in the mornings and would often go by Ms. Alford's house before he went to his job site.

On the date in question, Appellant got up at the same time he usually did. He put on his clothes and told the victim that he loved her. The victim told him to call her at 5:00 a.m. to make sure she was awake. He went into the kitchen and packed his lunch. He grabbed the spare key from underneath the garbage can and from his toolbox got the cell phone he used to call Ms. Alford. He got into his truck and started to go to work. Appellant called Ms. Alford before he left his street. Shortly thereafter, Appellant remembered he had forgotten some blueprints and returned to the house to retrieve them. He returned to his truck with the blueprints. He stopped at Catdaddy's Market to get a cup of coffee. He called Ms. Alford back. Appellant also stopped at Walmart in Morristown to use the restroom. Appellant arrived at Walters State Community College around 5:30 a.m. Appellant began calling his wife at 5:00 a.m. He parked his truck in the parking lot at Walters State. When he left his truck, Appellant left his

jacket which was wrapped around the victim's wallet and jewelry. He had taken items to see how much he could get if he sold them because he and the victim were having money problems. At trial he stated that he took the checkbook to help explain to the victim why her jewelry was gone. He took the key, "To explain how they got in to get the checkbook and the jewelry."

When Mr. Miller arrived Appellant told him that he could not get in touch with the victim. Mr. Miller showed Appellant what to do at the job site. He left Appellant there. Appellant spoke with Ms. Alford several times while at Walters State. He also called his father-in-law, Mr. Tolliver, that morning when he could not get in touch with the victim. Mr. Tolliver told Appellant that he would go check on the victim later. Appellant also spoke with his sister-in-law, Judy Miller. Mr. Miller returned to Walters State around 9:00 a.m. Mr. Miller picked up Appellant and told him to leave his truck. While in Mr. Miller's car, Mr. Miller told Appellant to call Mrs. Miller. Mrs. Miller informed Appellant that someone had broken into his house, and the victim was missing. Mr. Miller and Appellant stopped at a Texaco because Appellant was not feeling well. He did not throw up, but he did put cold water on his face.

Officer Seals pulled over Mr. Miller's car. Officer Seals spoke with Mr. Miller, and Mr. Miller returned to the car and began driving. Officer Seals pulled the car over again. He said that he needed to speak with Appellant, so Appellant walked back to the patrol car. Officer Seals escorted Appellant to the back of the rear passenger door. Appellant stepped inside, and Officer Seals patted him down and took Appellant's belongings. Officer Seals "ordered" Appellant to get in the back of the car. On the way to the house, Appellant asked Officer Seals several questions, but Officer Seals could not answer them because he had not been to the scene yet.

When they arrived at Appellant's house, Agent Whitson got into the patrol car with Appellant. Agent Whitson told Appellant that his wife was dead. Agent Whitson presented Appellant with the consents to search, and Appellant signed them. Appellant had no hesitation or reluctance to sign them. Two officers then transported Appellant to the CID Building. He arrived around 10:00 a.m. He went to the interrogation room with Agent Whitson and Detective Daniels. Agent Whitson asked Appellant several questions, but never insinuated that Appellant was involved in the death of his wife. He signed a statement at 1:42 p.m. The officers asked if Appellant would see another man later, and he said that he would. They also asked him for his clothes. He had no reservations about giving the officers his clothes. The officers brought him a jail uniform to wear with a pair of flip-flops. They told Appellant he was not in jail. Appellant testified that he did not feel free to leave. His personal property was returned around 4:00 p.m. He testified that he was getting ready to leave the CID Building, and an officer asked if he would mind staying to talk to the other officer who was on his way. Appellant stated that he would stay. Around 5:00 p.m., Appellant called his sister-in-law. The call lasted forty-seven minutes. She told him that his bicycle had been found in a ditch and Jonah's bat had been found in the weeds near the house. Danny and Deborah Chumley arrived around 6:30 p.m. He was outside when they arrived. He told Detective Daniels that he was going to go with the Chumleys. Detective Daniels told him he should wait for Agent Whitson, so he did.

Agent Elrod arrived. Appellant met with him in a separate office. Appellant signed a *Miranda* waiver before the interview. Agent Whitson did not stay in the room after the *Miranda* waiver was signed. Appellant testified that while Agent Elrod interviewed him, Agent Elrod gradually got closer to him. According to Appellant, Agent Elrod told Appellant exactly what he had done that morning and started making accusations. Appellant agreed with the accusations because he had no choice. When he agreed, Agent Elrod got Agent Whitson. Appellant testified that Agent Whitson had written out most of the statement before he brought it in to Appellant. He admitted to Agent Whitson that he and the victim had argued about Appellant wanting to get a motorcycle. He stated that he signed a statement admitting to killing his wife because he "was tired, [he] was confused, [he] was numb, [he] didn't know what to think or what to feel."

Appellant denied his entire statement during direct examination. He also denied that the bicycle found by Mr. Leach was his bicycle. He denied that the bat found near his house was his son's bat. Appellant denied killing his wife or hitting his wife. He stated that if he and his wife disagreed they would separate to collect their thoughts.

Following Appellant's testimony, the State put on its rebuttal proof. In the fall of 2004 and spring of 2005, Ms. Merlene Richards was the school resource officer at Powell Valley Elementary School, where the victim taught. In the spring, Ms. Richards witnessed Appellant barging into the school without signing in at the office. He proceeded to the victim's classroom where he began arguing with her. Ms. Richards said Appellant was yelling very loudly. Ms. Richards stood at the doorway of the classroom because she was concerned about the victim.

Mr. Emory Minton, Associate Pastor at Pump Springs Baptist Church, also testified for the State on rebuttal. He stated that he identified a photograph taken of a t-ball player at the Harrogate Little League Field. Mr. Minton stated that the photographer did not bring any props with him. On cross-examination, Mr. Minton stated that most players brought their own bats, but if they did not have theirs they often borrowed one from a friend for the pictures.

At the conclusion of the testimony, the parties made their closing arguments and the trial court instructed the jury. Following the deliberations, the jury found Appellant guilty of first degree murder. The trial court conducted a hearing on the penalty phase. After the presentation of evidence by both sides, the jury retired to deliberate. With regard to Appellant's penalty, the jury determined Appellant's sentence to be life with the possibility of parole.

Appellant appeals his conviction for first degree murder.

### ANALYSIS

Appellant argues several issues on appeal. He argues that the evidence was insufficient to support his conviction and that the trial court erred in denying his motion to suppress, in excluding three anonymous letters sent to Appellant and the Claiborne County Sheriff's Office, in denying his motion to exclude evidence in connection with the autopsy, in admitting autopsy photographs into evidence, in denying his motion to dismiss based upon the State's failure to preserve evidence, and in allowing the State to introduce evidence through a rebuttal witness.

### Trial Court's Denial of Appellant's Motion to Suppress

Appellant argues that: (1) having properly determined the government illegally seized him without probable cause or reasonable suspicion, the trial court erred when it improperly concluded that the consents to search executed by Appellant while still being detained were sufficiently attenuated from the initial illegal misconduct and, therefore, improperly allowed evidence flowing from the consents to search into evidence; (2) Appellant's consent to search his home and truck was involuntary and, therefore, the warrantless search and seizure of items and testimony therefrom were the product of an unreasonable search and seizure and the trial court erred in denying Appellant's motion to suppress and motion for new trial; (3) the trial court erred in denying Appellant's motion to suppress evidence found in his truck and subsequent motion for new trial when law enforcement exceeded the scope of Appellant's consent to search his truck when they relocated the truck from the area described in the consent form, secreted the truck in a non-government location, and kept the truck longer than was necessary to effectuate the purpose of the seizure; (4) the trial court erred in finding that Appellant voluntarily waived his right to remain silent and right to counsel before signing his statement and further erred in finding that the statement was voluntary; and (5) the trial court erred when it determined that Appellant's statement was sufficiently attenuated from the initial illegal arrest. The State argues that the trial court properly determined that Appellant voluntarily signed the consents to search his home and his vehicle and voluntarily waived his right to remain silent, as well as, voluntarily gave a statement to law enforcement officers. The State also argues that Appellant's statement was sufficiently attenuated from the

illegal arrest so that the trial court's determination to allow the statement into evidence was proper. The State also argues that the trial court properly denied Appellant's motion to suppress because law enforcement did not exceed the scope of the consent to search when the truck was relocated.

At the conclusion of the hearing on the motions to suppress, the trial court entered its ruling on the record. The trial court stated the following:

I'm gonna make some brief comments that hopefully will narrow the scope of all those interested. The first finding that I can make without an awful lot of—without an awful lot of problem is that it's clear to me that the consents given by the defendant, specifically the consent to search and the consent—to search the home and vehicle were given voluntarily.

I see no evidence in the record that would suggest that the—first of all, the defendant was not aware of his rights to refuse a consent to search, or that his will was overborne by any police action. In fact, I'm going to—other than the stop itself, and I'm going deal [sic] with that after I've done some more work—the stop itself—the stop itself, the evidence suggests that law enforcement engaged in overly cautious behavior as opposed to some subterfuge to have the defendant give a confession.

It's clear from the testimony of the witnesses that were called, one by the State, the other by the defendant—the friends of the defendant—the defendant was outside roaming around, was not in a—what we would normally call a hotbox situation where he was overborne. This was a—by all accounts, a comfortable situation the defendant was in at the time that he was held. I don't see any

evidence at all of coercion or subterfuge by law enforcement or anything that might suggest the defendant's will was overborne prior to giving the consent to search. And the same holds true at the time that the statement was given—the defendant's—what we'll call confession. I noticed that you filed a motion about that. We'll talk about that. But, whatever statement the defendant has given, in my opinion, was given voluntarily, with a full understanding of his rights to not give the statement. He had been Mirandized a number of times depending on which level of proof you want to believe. It doesn't matter. There was never a break from the defendant's waiver of *Miranda* or waiver of the consents to search.

So, I'm finding the issue—and I'm breaking this up for brevity—the issue of consent by the defendant to give search on both places, the vehicle and home, and the statement given to law enforcement, statements one and two, were properly—were properly taken; the defendant has waived any constitutional right he might have to not give the statement or not consent to the search.

So—and I'm gonna look at—I realize that *Coulter* might be the State's rescue if the—if the Court finds that the seizure was illegal and poisoned everything beyond. We'll talk about that after I've had a chance to look at *Coulter*.

. . . .

All right. The Court has summarily reviewed the evidence, the concessions made by each party concerning pieces of evidence that may not have been either prevalent in the record or noticed by the Court, but all that being said, this was quite a voluminous hearing, and the law in the case is a little more complicated than most search issues—or seizure issues are concerned.

In substance, you have a crime scene that was investigated prior to any consent which leads us to question one, everything prior to the consent, was it—is that something that can be saved by the State. Then we have the seizure of the defendant and subsequent actions after that and then whether or not the seizure was illegal, and if so, what is the effect.

Let's go chronologically. The first issue the Court is going to address is whether or not re-entry into the home of the crime scene and the gaining of evidence from the re-entry, which would be in the form of photographs and testimony about items seen, the Court finds that the *Levie* case or *Levi*, depending upon the pronunciation—excuse me—the *Coulter* matter—excuse me. The *Coulter* matter sufficiently answered the question for the Court. The Court believes that the exigent circumstances combined with the plain view doctrine would have allowed law enforcement during that period of time to not only view evidence the first time but secure that evidence that was viewed at the time of that first entry. So I find no problem with law enforcement's obtaining that evidence and introducing that at trial.

It becomes a little more—a little more concerning, the actions that took place afterward, and I'm talking specifically at the time that the arrest/seizure of the defendant was made by law enforcement. Reviewing the law, and this is something of a review of old search and seizure concepts, the Court is going to find that based on the evidence that I heard, that the arrest or the seizure made of the defendant at approximately 9:30 [a.m.] would have constituted an illegal arrest, although there may have

been information out there that would have constituted probable cause, at that point, once law enforcement takes a person into custody, there must be ostensible evidence to suggest the guilt of the defendant. It may have been out there, but I'm—there's a gap in the proof here as to why law enforcement stopped the car and put the defendant in the patrol car, and I'm simply saying that there is just nothing in the record to suggest what that probable cause might have been, other than evidence that was being seized and obtained at the home. And there is something of a logical break in that.

So the question becomes an illegal seizure and evidence obtained and consents to—and to consents obtained after that illegal seizure—what happens and what does the Court do with that. In reviewing the authorities provided by the State, this Court is applying the test as to whether or not the consents and the statement after *Miranda* were both voluntary and not as a result of exploitation of the prior illegality.

The State went into great length as to law enforcement's efforts and the freedoms that they were allowing the defendant. It's clear to this Court that law enforcement did not exploit the illegal—or seizure of the defendant.

The fact that the defendant was moved from an independent vehicle to a law enforcement car, there's been no evidence to suggest that that act itself had a—had an effect on the defendant's future actions. I'm reading the authorities, and I think [Appellant's attorney] make—attempts to make the point that law enforcement by arresting someone—by simple arrest, grabs authority of that person, and the—and common people would fall into a—somewhat of a trap by that—by that assertion of authority. There's been no showing in this particular case that that authority was used to obtain anything else. In fact, as I said earlier, whether it was a mistake, whether it was a miscalculation, I don't know, but it seemed to be an act of caution not meant to exploit that authority over the defendant.

Going on to the second part of that test, was any consent or statement made on a voluntary basis? The proof in this case is very clear. The defendant made a—his rights were afforded to him many times. He was—they were offered to him. Each time he seemed to understand; there's no evidence to the contrary. Although there—[Appellant's attorney] pointed out there was certainly an emotional outbreak when the defendant first learned from law enforcement that his wife had not survived, that in and of itself is not enough to suggest the defendant did not understand any rights that he may have waived afterward. Therefore, I do find that every—every consent to search signed, every statement that was adopted by the defendant and every act beyond the arrest will meet the criteria the State must—must have shown the defendant made these voluntary statements, and there was no exploitation—I'm gonna find the State has met that burden.

So, let me summarize my ruling. I find that the seizure was unlawful. There's no evidence in the record to suggest that that should have occurred. However, I find that the—that the consents and the statements were both voluntary and not the product of an exploitation of this prior illegality.

[Following the trial court's ruling on the motion to suppress, Appellant's attorney filed a memorandum of law concerning the motion to suppress. The trial court agreed to take it under advisement and review its ruling.]

All right. The Court's had the opportunity now to review the memorandum of law filed by the defendant in this case. The Court is of the opinion that the— upon review of the—upon review of the defendant's brief that there is no change in the Court's ruling. [Appellant's attorney] had said something to the effect that the exploitation argument offered by the State was something of a surprise. The *Garcia* case listed in the—in the defendant's brief or memorandum sets out term exploitation in the same context as the—as the term—the attenuated situation. So, as the Court said before I took the final break, I equate them to be one in the same, and I don't see any reason to change my previous ruling.

▰ This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn.2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996)). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn.2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn.1998)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn.1997)). When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions and the trial court's findings of fact are subject to de novo review. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn.2000). The trial court's determination at the suppression hearing that a confession was voluntary is presumptively correct on appeal. *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994). Further, we note that in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn.1998).

On appeal, Appellant argues that the trial court erred in failing to suppress certain items of evidence. Appellant argues that his initial seizure was illegal and the written consents to search his home and his truck obtained by law enforcement were not sufficiently attenuated from his illegal seizure. Appellant also argues that his statement made at the CID Building was also a product of the illegal seizure.

▰ As stated above, the trial court determined that Officer Seals's placement of Appellant into the patrol car constituted an illegal seizure. We find that the evidence does not preponderate against that finding. Officer Seals and Detective Cornett testified that Appellant was not under arrest and was placed in the patrol car for his safety because a large number of people had gathered at the scene. However, Appellant was frisked, read his *Miranda* rights, and placed into the rear of the patrol car, the doors of which could only be opened from the outside. In *State v. Gonzalez*, 52 S.W.3d 90 (Tenn.Crim.App.2000), we stated that the test for determining whether a seizure has occurred is "[i]f a reasonable person would not feel free to leave due to an officer's show of authority,

that constitutes a seizure, regardless of why the officer made a show of authority." 52 S.W.3d at 98.

As the trial court stated in its ruling, there was no evidence of probable cause at that point and time upon which to base an arrest of Appellant. Therefore, the seizure was illegal. We now address whether the subsequent search of Appellant's home and truck were legal despite his illegal arrest.

### A. Search of Home and Truck

■ As stated above, Appellant argues that his consent to search the house and truck were not voluntary due to his illegal seizure. Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures by government agents. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn.1998) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)). The Tennessee Supreme Court has noted previously that "[a]rticle I, [section] 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment [of the United States Constitution]," and that federal cases applying the Fourth Amendment should be regarded as "particularly persuasive." Sneed v. State, 221 Tenn. 6, 423 S.W.2d 857, 860 (1968).

■ We begin our review by observing that "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629. That is, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. Id.

■ The main exceptions to the requirement for a search warrant are: (1) consent to search; (2) a search incident to a lawful arrest; (3) probable cause to search with exigent circumstances; (4) in hot pursuit; (5) a stop and frisk situation; and (6) plain view. See State v. Meeks, 262 S.W.3d 710, 722 (Tenn.2008); State v. Bartram, 925 S.W.2d 227, 230 n. 2 (Tenn. 1996). "If the circumstances of a challenged search and seizure come within one of the recognized exceptions, the fruits of that search and seizure are not subject to operation of the exclusionary rule and may be properly admitted into evidence." State v. Shaw, 603 S.W.2d 741, 743 (Tenn. Crim.App.1980).

In the case sub judice, the facts are complicated by the determination that the initial seizure was illegal. Our supreme court has stated that, "'a consent to search that is preceded by an illegal seizure is not "fruit of the poisonous tree" if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality.'" State v. Garcia, 123 S.W.3d 335, 346 (Tenn. 2003) (quoting Wayne LaFave, 3 Search and Seizure § 8.2(d) at 656 (3 ed.1996)). The trial court found that Appellant's consents to search the house and his truck were voluntary and not an exploitation of the prior illegal search.

■ We agree that Appellant's consents to search were voluntary however, our analysis does not end there. In State

v. *Huddleston,* 924 S.W.2d 666 (Tenn. 1996), our supreme court adopted the factors set out in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to evaluate whether a confession made after an illegal seizure was sufficiently attenuated to be admissible. *Garcia,* 123 S.W.3d at 346. Subsequently in *Garcia,* our supreme court applied the *Brown* factors to evaluate whether products from a search subsequent to an illegal seizure would be admissible. *Id.* To determine "whether the primary taint of an unlawful seizure has been sufficiently attenuated from the voluntary consent ..." the following factors are to be considered: "1) the temporal proximity of the illegal seizure and consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254).

With regard to the first factor, the temporal proximity of the illegal seizure to the consent, the court in *Garcia* stated that several courts had noted, " '[a] brief time lapse between a Fourth Amendment violation and consent often indicates exploitation [of the prior police action] because the effects of the misconduct have not had time to dissipate.' " *Id.* (quoting *State v. Hansen,* 63 P.3d 650, 666 (Utah 2002)). In the case sub judice, the evidence showed at the suppression hearing that Officer Seals placed Appellant in his patrol car around 9:30 a.m. Officer Seals arrived at the scene with Appellant about 9:45 a.m. By all accounts, Agent Whitson promptly got in the back of the patrol car with Appellant and executed the consents to search. The time lapse between the illegal seizure and the signing of the consents to search could not have been more than thirty minutes. Therefore, we conclude that that short of a time period is not sufficient for the effects of the misconduct to dissipate fully.

The next *Brown* factor is whether there were intervening circumstances. In *Garcia,* a law enforcement officer stating a driver was free to go was interpreted as an intervening circumstance which attenuated the illegal seizure from the consent. *Id.* at 347. It appears that there is no such intervening circumstance in the facts of this case.

The most important *Brown* factor is the third factor, the purpose and flagrancy of the official misconduct. *Id.* This is the most important factor because "it is the most closely tied to the rationale of the exclusionary rule—to discourage police misconduct." *Id.* In the case sub judice, Agent Whitson got into the back of the patrol car with Appellant. As stated above, the doors to the back of the patrol car could only be opened from the outside. Agent Whitson told Appellant his wife had died and subsequently asked Appellant for consent to search both the house and his truck. The purpose was to gather evidence to determine who had murdered Appellant's wife. Agent Whitson stated that he believed the urgency of the situation necessitated that he obtain consent as opposed to waiting for a search warrant. It may be true that there were somewhat urgent circumstances, but at the time he obtained Appellant's consent, Agent Whitson had no basis for a reasonable suspicion that Appellant was involved. In addition, any person would undoubtedly feel intimidated by Agent Whitson's request while he was in the back of a patrol car. Appellant was immediately taken to the CID Building after signing the consent forms. He was not even allowed in his house or to check on his children. We find the circumstances under which Agent Whitson obtained Appellant's consent bordering on flagrant misconduct. Therefore, we conclude that the State cannot meet the three requirements in *Brown* which would en-

able the evidence found at the residence and truck to be admitted at trial.

### 1. Search of Home

■ However, as stated above, Appellant's consent to search is not the only way in which law enforcement may permissibly conduct a search without a search warrant. One of the enumerated exceptions to the warrant requirement is exigent circumstances. "Although not an exclusive list, the following are frequently-arising situations that have been found to be sufficiently exigent to render a warrantless search of a domicile reasonable: (1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." *Meeks,* 262 S.W.3d at 723. The mere existence of these circumstances does not necessarily validate a warrantless search. The State is required to show that "the exigencies of the situation made the search imperative." *Yeargan,* 958 S.W.2d at 635.

This Court faced a substantially similar set of facts in *State v. Coulter,* 67 S.W.3d 3 (Tenn.Crim.App.2001), *perm. app. denied,* (Tenn.2001). In *Coulter,* the defendant was convicted of the first degree premeditated murder of his wife. 67 S.W.3d at 3. On the evening of the murder, the defendant walked into the police department and announced that he had just killed his wife. *Id.* at 16. An officer questioned him and he reiterated that he had killed his wife and she was at their mobile home. *Id.* The officer drove the defendant to his home where they met a second officer. When the officers entered the home, they found the victim's body lying on the bed. *Id.* Other officers arrived to process the scene and collect evidence. *Id.* at 16–17.

The defendant filed a pre-trial motion to suppress both his statements to the police officers and the evidence obtained at the scene. *Id.* at 33. Among his issues in his motion to suppress was that the police did not have a warrant to search his house. Following a hearing, the trial court denied the motion. *Id.* at 36. The defendant conceded on appeal that the officers could initially enter his home lawfully due to exigent circumstances. *Id.* at 39. However, he contended that any subsequent entries to process the scene and collect evidence required a search warrant. *Id.*

This Court set out the following summary of the law with regard to warrantless searches pursuant to exigent circumstances:

> More specifically, the Court in *Mincey* [*v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978),] observed that police may enter a home and conduct a search without a warrant "when they reasonably believe that a person within is in need of immediate aid." 437 U.S. at 392, 98 S.Ct. at 2413; *see also Flippo* [*v. West Virginia* ], 528 U.S. [11,] 14, 120 S.Ct. [7,] 8, 145 L.Ed.2d 16 [ (1999) ]; *Thompson* [*v. Louisiana* ], 469 U.S. [17,] 21, 105 S.Ct. [409,] 411, 83 L.Ed.2d 246 [ (1984) ]; [*State v.*] *Tyler,* 598 S.W.2d [798,] 801 [ (Tenn.Crim.App.1980) ]. In this regard, the State "must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house ... required immediate assistance." *United States v. Arch,* 7 F.3d 1300, 1304 (7th Cir.1993). Additionally, if the police come upon the scene of a homicide, the officers may "make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises."

*Mincey,* 437 U.S. at 392, 98 S.Ct. at 2413.

The Court in *Mincey* emphasized that any warrantless search "must be 'strictly circumscribed by the exigencies which justify its initiation.'" 437 U.S. at 393, 98 S.Ct. at 2413. However, in [*Arizona v.*] *Hicks,* 480 U.S. [321,] 325–326, 107 S.Ct. [1149,] 1153, 94 L.Ed.2d 347 [ (1987) ] (citation omitted), the Court further clarified that

> *Mincey v. Arizona,* ... in saying that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation," was addressing only the scope of the primary search itself, and was not overruling by implication the many cases acknowledging that the "plain view" doctrine can legitimate action beyond that scope.

The plain view doctrine provides that, under certain circumstances, the police may seize evidence in plain view without a warrant. *Coolidge* [*v. New Hampshire* ], 403 U.S. [443,] 465, 91 S.Ct. [2022,] 2037, 29 L.Ed.2d 564 [ (1971) ] (plurality opinion). Under the federal constitution, prerequisites to the application of the plain view doctrine include: (1) the officer did not violate constitutional mandates in arriving at the location from which the evidence could plainly be seen; (2) the officer had a lawful right of access to the evidence; and (3) the incriminating character of the evidence was "immediately apparent," i.e., the officer possessed probable cause to believe that the item in plain view was evidence of a crime or contraband. *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 2136–2137, 124 L.Ed.2d 334 (1993); *Soldal v. Cook County, Illinois,* 506 U.S. 56, 65–66, 113 S.Ct. 538, 545–546, 121 L.Ed.2d 450 (1992); *Horton v. California,* 496 U.S. 128, 136–137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990); *Hicks,* 480 U.S. at 326–327, 107 S.Ct. at 1153–1154. Accordingly, when an officer enters private premises pursuant to exigent or emergency circumstances, the officer may generally seize any apparently incriminating items located on the premises in plain view. Furthermore, an officer may "record by photography scenes presented to [his] plain view." *Bills v. Aseltine,* 958 F.2d 697, 707 (6th Cir. 1992); *see also People v. Reynolds,* 672 P.2d 529, 532–533 (Colo.1983).

*Id.* at 42–43.

The Court went on to analyze the issue of warrantless second entries made by other law enforcement personnel to collect evidence. *Id.* at 44–45. Referencing opinions from other jurisdictions, this Court concluded that warrantless second entries can be made by additional law enforcement personnel for the collection of evidence, so long as it is in "plain view," as is required for evidence during the initial entry. *Id.* at 44–45. This Court recited the following analysis of the warrantless second entry:

> [W]hen a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry. Under such circumstances, it is permissible for the detectives to [seize,] photograph and take measurements [of], without a search warrant, ... evidence which was in the plain view of the initial responding officers.

*State v. Magnano,* 204 Conn. 259, 528 A.2d 760, 764 (1987); *see also State v. Spears,* 560 So.2d 1145, 1150–1151 (Ala. Crim.App.1989); *Wofford* [*v. State* ], 330 Ark. 8, 952 S.W.2d [646,] 653–654 [1997];

*State v. Johnson,* 413 A.2d 931, 933–934 (Maine 1980); *Hunter v. Commonwealth,* 8 Va.App. 81, 378 S.E.2d 634, 635–636 (1989); *La Fournier v. State,* 91 Wis.2d 61, 280 N.W.2d 746, 750–751 (1979). "Whether a subsequent entry is detached from an initial exigency and warrantless entry or is a continuation of the lawful initial entry can be determined only in light of the facts and circumstances of each case," including the time interval between the two entries and the extent to which the later officers do no more than the initial responding officer or officers would have been justified in doing. *La Fournier,* 280 N.W.2d at 750; *cf. Tyler,* 598 S.W.2d at 801–802.

*Id.* at 44.

This Court also set out two additional rationales for the approval of warrantless second entries. One rationale attributed to the United States Court of Appeals for the Fifth Circuit states that once an individual's Fourth Amendment interest against the invasion of privacy is legally invaded by law enforcement personnel, " 'the citizen has lost his reasonable expectation of privacy to the extent of the invasion.' " *Id.* (quoting *United States v. Brand,* 556 F.2d 1312, 1317 (5th Cir.1977)). A third approach cited by this Court is derived from the North Carolina Supreme Court and states that if an officer responds to a call for help and discovers a crime scene, all property associated with the crime scene and in plain view can be lawfully seized so long as the officer secures the crime scene from non-law enforcement. *Id.* 44–45 (citing *State v. Jolley,* 312 N.C. 296, 321 S.E.2d 883, 886 (1984)). In addition, any officers who arrive later while the crime scene is still secured can also " 'examine and remove property without a search warrant.' " *Id.* (quoting *Jolley,* 321 S.E.2d at 886). In *Coulter,* this Court did not specifically adopt one rationale over

another for a warrantless second entry. *Id.* at 45. Instead, the Court stated that the facts would fit within any of the three rationales to support the introduction of the evidence submitted as a result of a warrantless second entry.

We come to the same conclusion in the case at hand. In this case, the victim's father telephoned 911 after finding his daughter in the corner of her bedroom, the walls of which were covered in blood. Law enforcement and an ambulance team responded to the call. After ascertaining that the victim was deceased, a crime scene processing team arrived and began collecting evidence. The evidence collected was evidence that was in plain view of the officers as they made their way from the back door of the home, the main point of entry, to the victim's bedroom, where the victim's body was found.

 It is clear that the officers' initial entry into the victim's home would be considered an exigent circumstance. The victim's father telephoned the 911 operator to summon help to the victim's home. As in *Coulter,* when the defendant told the police that he killed his wife in his home, Mr. Tolliver's 911 call would give the officers "a 'reasonable belief' that a person inside the [ ] home was in need of immediate aid." *Id.* at 43. As for the subsequent entries, the initial entry and subsequent entries were closely connected in time. In addition, law enforcement officers testified that the home was secured against entry by persons other then law enforcement. Both these facts fall within that anticipated by the three rationales set out above.

The question now becomes whether the evidence taken was in "plain view." In his motion to suppress, Appellant stated that he wanted to suppress: "Items taken or otherwise photographed within [address of the victim's home]; Items seized and or

otherwise photographed." The evidence presented at trial consisted of the victim's jewelry and wallet, pieces of carpet from the bedroom and photographs and measurements of the crime scene. The items of evidence from Appellant's house were all within the plain view of the officers as they walked from the door to the back bedroom.

For the above reasons, we conclude that the evidence found in the residence was properly admitted at trial, albeit for different reasons than those found by the trial court. Therefore, this issue is without merit.

### 2. Search of Truck

■ As stated above, we previously determined that Appellant's consent to search his home and truck were voluntary but not sufficiently attenuated from his initial illegal seizure to support introduction of evidence found as a result of the searches conducted without valid consent. This however does not end our inquiry as to whether the evidence may lawfully be introduced under another theory which validates the search of the truck.

In this case, Appellant's truck was left in a parking lot of a community college. Local officers with the Morristown Police Department arrived at the parking lot and watched the truck until Officer Cornett and Sergeant Cline arrived. When he looked through the car window, Officer Cornett noticed that there was a camouflage jacket tied in a knot lying on the floor board, in plain view. The two officers watched the truck until the tow truck arrived to take the truck back to Claiborne County. The truck was towed to the tow truck owner's garage where it was secured in a locked building. The truck was not searched until the TBI arrived to search

the truck around 9:00 p.m. Until that time, the truck was under constant surveillance or was in a locked building.

The search of the truck revealed Ms. Brock's identification, checkbook and rings which were missing from her residence. The items were wrapped in Appellant's jacket in the floorboard of the vehicle.

■ At the time the truck was initially seized and impounded, officers had no more probable cause to do so than they had when Appellant was initially seized. Neither does it appear that the officers had probable cause to "pop the locks" on the truck and search it. However, after Appellant confessed to the murder and indicated Ms. Brock's effects were in the truck, officers had ample probable cause to seize and search the vehicle.[2] Therefore the items seized from the truck would have been inevitably discovered following Appellant's confession whether the truck was searched at the parking lot of the community college or at the tow truck company's lockup. Under the inevitable discovery doctrine, illegally obtained evidence may be admitted at trial if the evidence would have inevitably been discovered though lawful means. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *State v. Cothran,* 115 S.W.3d 513, 525 (Tenn.Crim.App.2003); *State v. Ensley,* 956 S.W.2d 502, 511 (Tenn.Crim.App. 1996). This doctrine was formulated as an exception to the exclusionary rule. *Nix,* 467 U.S. at 446, 104 S.Ct. 2501.

It is clear that if officers had simply waited, following Appellant's confession, the truck could have been lawfully seized and searched. Under these circumstances we decline to apply the exclusionary rule to the illegally seized and searched truck.

---

**2.** This same analysis might also be said to apply to the search of Appellant's residence. It is indeed inevitable that a known homicide scene with a body present would eventually have been searched by lawful means.

Therefore, we affirm the trial court's decision albeit for different reasons.

### B. Statement at CID Building

 Appellant argues on appeal that the trial court erred in failing to suppress his statement made to Agent Whitson at the CID Building. Appellant argues that his statement was not voluntary under the Fifth Amendment and if it was voluntary was not sufficiently attenuated from his illegal seizure in violation of the Fourth Amendment.

 The Fifth Amendment to the United States Constitution provides in part that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the United States Supreme Court held that a suspect

> [M]ust be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479, 86 S.Ct. 1602. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. *Id.* Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by *Miranda*. *Id.* at 444, 86 S.Ct. 1602. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. *Stephenson*, 878 S.W.2d at 545.

In *State v. Burtis*, 664 S.W.2d 305 (Tenn.Crim.App.1983), this Court dealt with the question as to whether a confession was voluntary. *Id.* Our supreme court subsequently determined that the same analysis applied to all statements made to law enforcement officers after an illegal arrest not just to confessions. *Huddleston*, 924 S.W.2d at 674.

 In order to be considered voluntary, the statement "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *see also State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn.1996). Instead, " 'coercive police activity is a necessary predicate to finding that a confession is not voluntary....' " *Id.* (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn.1994)). Whether or not a statement was voluntarily given is determined by examining the totality of the circumstances. *See Kelly*, 603 S.W.2d at 728–29.

Rule 5(a) of the Tennessee Rules of Criminal Procedure requires that an individual arrested without a warrant be taken to a magistrate "without unnecessary delay." Tennessee courts have been called upon to determine whether a defendant's

confessions have been given involuntarily as a result of their detention in violation of Rule 5(a). *See State v. Carter*, 16 S.W.3d 762, 768–69 (Tenn.2000); *Huddleston*, 924 S.W.2d at 670; *State v. Readus*, 764 S.W.2d 770, 774 (Tenn.Crim.App.1988). In *Carter*, our supreme court relied on its holding in *Huddleston* when it set out the following considerations when determining if a confession was given voluntarily:

> In determining if a confession was voluntary, courts are to consider the following:
>
>> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.
>
> [*Huddleston*, 924 S.W.2d] at 671 (citing *State v. Readus*, 764 S.W.2d 770, 774 (Tenn.Crim.App.1988)). Thus, "the focus on unnecessary delay should not be solely on the length of the delay, but rather on the circumstances of the delay and their effect on the accused." *Huddleston* [,] 924 S.W.2d at 671.

*Carter*, 16 S.W.3d at 769.

In the case sub judice, at the time of the murder, Appellant was thirty-four years old. Appellant had a high school diploma, but no further schooling. There was no evidence presented that Appellant's intelligence is below average in any way. On the day of the murder, Appellant was given his *Miranda* warnings twice, once by Officer Seals before Appellant got into the patrol car and once by Agent Elrod before the polygraph examination began. According to the testimony of the law enforcement officers, Appellant was taken to the CID Building around 9:45 a.m., gave his initial statement at 1:42 p.m., and began the polygraph examination around 8:00 p.m. During the time between his arrival and the polygraph examination, Appellant was allowed uninterrupted use of his cellphone. The officers provided sandwiches and drinks to Appellant even though Appellant told them he was not hungry. Appellant was also allowed to roam freely throughout the CID Building. He was also allowed to go outside the building. He was allowed visitors. When his friends the Chumleys arrived, they found Appellant outside of the building. Appellant told one of the officers he wanted to leave with the Chumleys. When the officer told him the polygraph examiner was almost to the CID Building, Appellant changed his mind and decided to stay.

There is no evidence of overt coercive activity on the part of the police. However, we are troubled by the officers taking Appellant's clothes and providing a jail uniform for Appellant to wear. Appellant did have ample opportunity to request someone to bring him clothes. Moreover, Agent Whitson asked if he could bring Appellant clothes when he left to return to the scene. Appellant had phone conversations with various family members from whom he could have also requested clothing. When the Chumleys left Appellant at the CID Building, they were going to get clothes for Appellant. Therefore, we conclude that this incident is not so coercive

as to negate the other factors at play during his time at the CID Building.

Based upon the above factors and the totality of the circumstances, we conclude that Appellant's statement was voluntary. Appellant was given his *Miranda* warnings twice during the day. He was allowed to roam the building freely and allowed to use his cellphone and have visitors. There was not an on-going interrogation between his initial statement and the polygraph examination. He was not deprived of food or sleep, and the twelve hours he spent at the CID Building were relatively short for cases of this nature.

■ Although we have determined that Appellant's statement was voluntary, our analysis does not stop there. Even in the case of an illegal arrest, a statement does not have to be suppressed "if it was voluntary under the Fifth Amendment and there were sufficient intervening circumstances to break the causal connection between the illegal arrest and the confession, so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *State v. Burtis,* 664 S.W.2d 305, 308 (Tenn. Crim.App.1983) (citing *Brown,* 422 U.S. at 602, 95 S.Ct. 2254; *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982)). In *Burtis,* we stated the following:

> The fact that a confession may be voluntary for purposes of the Fifth Amendment is not by itself sufficient to purge the taint of an illegal arrest. A finding of "voluntariness" for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis.... The relevant inquiry is whether the confession was obtained by exploitation of the illegal arrest.

To determine whether a confession has been purged of the taint of the original arrest, the following factors must be examined:

1. The giving of proper *Miranda* warnings;

2. The temporal proximity of the arrest and the confession;

3. The presence of intervening circumstances; and, particularly,

4. The purpose and flagrancy of the official misconduct.

*Brown v. Illinois, supra,* 422 U.S. at 603–604, 95 S.Ct. at 2261–2262, *State v. Chandler,* 547 S.W.2d 918, 920 (Tenn. 1977).

*Id.* (citations omitted). The overriding question, however, is whether the behavior of law enforcement officials served to overbear the defendant's will to resist. *See Kelly,* 603 S.W.2d at 728; *see State v. Howard,* 617 S.W.2d 656, 658–59 (Tenn. Crim.App.1981).

In *Rawlings v. Kentucky,* 448 U.S. 98, 100, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the United States Supreme Court applied the factors announced in *Brown* to a similar situation as that in the instant case. 448 U.S. at 106–110, 100 S.Ct. 2556. In *Rawlings,* officers in Bowling Green, Kentucky arrived at a private address to arrest an individual on charges of drug distribution. *Id.* at 100, 100 S.Ct. 2556. Upon their arrival, there were four or five other individuals at the house. During their search of the house for the object of the arrest warrant, the officers smelled marijuana smoke and saw marijuana seeds. *Id.* Two officers left the scene to secure a search warrant, and four officers remained to detain the individuals who were in the house at the time. The officers allowed individuals to leave if they consented to a body search. *Id.* Two individuals consented to the search and left the house. The remaining individuals waited about forty-five minutes until the two officers returned with the search warrant. *Id.* The officers read the individu-

als their *Miranda* rights and proceeded to search the house and the individuals. One woman was asked to empty the contents of her purse, which contained a myriad of controlled substances. The defendant claimed the controlled substances as his. *Id.* at 101, 100 S.Ct. 2556. The defendant was arrested and indicted. He later moved to suppress his admission that the controlled substances were his. *Id.* at 106, 100 S.Ct. 2556.

The Supreme Court applied the *Brown* factors to the facts and determined that the defendant's statement was not tainted by the illegal detention and was admissible. *Id.* at 107–10, 100 S.Ct. 2556. The Court stated that for the first factor, the defendant had received his *Miranda* warnings just moments before he made the incriminating statements. *Id.* at 108, 100 S.Ct. 2556. With regard to the second factor, the Court focused on the conditions of the detention. The Court pointed out that the defendant had been detained only forty-five minutes. Such a short time period is usually not enough time to purge any taint from an illegal detention. However, under the facts in *Rawlings,* the conditions of the detention were such that any taint was purged. The Court listed several reasons including that the individuals were allowed to freely move about the first floor of the house; both the officers and the detainees stated that everyone was cordial to each other; and the detainees testified that there were no shows of force or violence on the part of the officers. *Id.* The third factor, whether there were any intervening circumstances, was satisfied by the conclusion that the defendant's admission was spontaneous and, therefore, weighed heavily that it was an act of free will. *Id.* As for the fourth factor, the Supreme Court stated that the conduct of the officers during the detention of the individuals did not constitute flagrant misconduct. *Id.* at 109–10, 100 S.Ct. 2556. After the analysis of the *Brown* factors, the Supreme Court held that the defendant's admission should not be suppressed because it was given by his own free will. *Id.* at 110, 100 S.Ct. 2556.

We conclude that the facts in the case at hand lead to a similar conclusion. For the first factor, as we have stated above, the officers gave Appellant his *Miranda* warnings twice, once immediately before he made the statement in question. Therefore, this weighs in favor of admission. For the second *Brown* factor, the length of detention was relatively short for a case of this nature. *Carter* dealt with a detention of 72 hours, and the detention in *Huddleston* was for 48 hours. Therefore, this factor weighs in favor of admission. The third *Brown* factor is whether there are any intervening circumstances. An intervening circumstance may involve "consultation with an attorney, relative, friend or priest prior to the time a statement is given." *Huddleston,* 924 S.W.2d at 675; *see also Carter,* 16 S.W.3d at 767. Appellant was allowed unlimited use of his cellphone. At one point, Appellant called his sister-in-law, the victim's sister, and spoke with several members of the family. He was also allowed to visit with his friends, the Chumleys. Clearly, these constitute intervening circumstances. Therefore, this factor weighs in favor of admission. The final factor is the purpose and flagrancy of the police conduct. We have already referenced the incident relating to the taking of Appellant's clothes. However, even with this misconduct, the officers' treatment of Appellant is not so flagrant to overbear Appellant's will to resist the questioning. This is especially true given the freedom that Appellant was given while at the CID Building. Therefore, this factor does not weigh against admission.

Therefore, the trial court did not err in denying Appellant's motions to suppress the results of the search of his home and truck and his statement to officers at the CID Building.

### Anonymous Letters

■ Appellant's next issue is that the trial court erred in excluding three anonymous letters sent to the Claiborne County Sheriff's office and Appellant. On May 26, 2006, Appellant filed a motion in limine for the introduction of the letters pursuant to Rule 804(b)(3) of the Tennessee Rules of Evidence. On the same date, the State filed a motion to exclude the letters. The three letters in question contained statements admitting to the murder of the victim. In a pre-trial hearing the trial court determined that Appellant could not introduce the letters pursuant to Rule 804(b)(3). The trial court based this conclusion in part on the fact that Appellant could not provide the declarant because the declarant's identity was unknown. Appellant argues on appeal that the letters confessing to the murder are against the letter writer's interest and that it is not necessary to identify the letter writer for purposes of the rule if the declarant is unavailable.

■ "Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn.2004). Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay statements are generally not allowed into evidence. Tenn. R. Evid. 802. However, the Tennessee Rules of Evidence provide for exceptions to the hearsay rule. *See* Tenn. R. Evid. 803 & 804. These exceptions have

been carved out because they "bear sufficient indicia of reliability and trustworthiness to warrant admission." *State v. Henry*, 33 S.W.3d 797, 802 (Tenn.2000). One such exception is when the declarant is unavailable. Tenn. R. Evid. 804. Rule 804(b)(3) of the Tennessee Rules of Evidence states:

(b) **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Rule 804(b)(3) allows for the introduction of declarations against penal interest. Tenn. R. Evid. 804(b)(3), Advisory Comm. Comts. "However, when information is provided by an anonymous citizen, this raises heightened concerns about the reliability of the information, such as the possibility of 'false reports, through police fabrication or from vindictive or unreliable informants.'" *State v. Wilhoit*, 962 S.W.2d 482, 487 (Tenn.Crim.App.1997) (quoting *State v. Pulley*, 863 S.W.2d 29, 31 (Tenn.1993)). It is up to the trial court to determine whether a statement is believable, and this Court will not overturn the trial court's decision in this regard unless there is an abuse of discretion. *See State v. James Blanton*, No. 01C01–9307–CC–00218, 1996 WL 219609, at *33–34 (Tenn. Crim.App., at Nashville, Apr. 30, 1996).

This Court faced a similar scenario in *State v. Marlon Duane Kiser*, No. E2005–02406–CCA–R3–DD, 2007 WL 4207903

(Tenn.Crim.App., at Knoxville, Nov. 29, 2007). In *Marlon Duane Kiser,* an anonymous caller called the public defender and stated that the defendant did not shoot the victim. The caller went on to state that he had a tape recording in which another individual confessed to the crime. *Marlon Duane Kiser,* 2007 WL 4207903, at *41. The caller did not call again and did not deliver the tapes. *Id.* At a pre-trial hearing, the defendant moved to introduce a tape recording of the anonymous caller's conversation with the public defender based upon Rule 804(b)(3). *Id.* The trial court ruled the taped conversation did not constitute a statement against interest because an anonymous caller does not expect to be identified. *Id.* This Court affirmed the trial court and stated:

> In this case, the identity of the caller was never established conclusively. The trial court concluded that the caller's statements were inadmissible because the caller, thinking he would never be discovered, did not believe he was subjecting himself to any criminal liability. We agree. *See United States v. Burks,* 36 M.J. 447, 451 n. 2 (C.M.A.1993) (stating that "we are at a loss to understand how it may logically be concluded that the anonymous writer of a self-incriminating letter has made any statement that truly is against the writer's penal interests"); *State v. Tucker,* 331 N.C. 12, 414 S.E.2d 548, 555 (N.C.1992) (providing that in order for a hearsay statement to be admissible under this exception to the hearsay rule, the statement "must actually subject the declarant to criminal liability" and that "[a]n anonymous letter does not satisfy this element because a declarant who conceals his identity does not tend to expose himself to criminal liability"). Furthermore, a declarant's statements should not be admitted under this exception to the hearsay rule "if it is established that the declarant did not know that the statement was harmful. For example, if the declarant actually believed that he or she was saying something that would be helpful, reliability is questionable and the statement should not be admitted under this hearsay exception." Neil P. Cohen *et al., Tennessee Law of Evidence,* § 8.36[5] (5th ed.2005). The caller obviously believed he was saying something helpful, informing [public defender] that he could not allow an innocent man go to jail.

*Id.* at *43.

The same analysis applies to the case at hand. The letter writer's identity was never discovered. Therefore, the letter writer has not exposed himself or herself to any criminal liability. In addition, the letter writer's statement would be helpful to Appellant. By confessing to the crime, the letter writer had to intend to help Appellant's chances at trial. For these reasons, the reliability of the contents of the letters is very questionable.

Therefore, we conclude that the trial court did not abuse its discretion in excluding the letters at trial.

### Autopsy Order

■ Appellant's next issue is that the trial court erred in denying his motion to exclude all evidence relating to the victim's autopsy because the autopsy order was not signed by the medical examiner, but instead by Detective Daniels in the following manner: "Jerod Effler w/permission D. Daniels." The State argues that the trial court properly allowed the introduction of the autopsy derived evidence.

Tennessee Code Annotated section 38–7–106(a) states:

(a) A county medical examiner may perform or order an autopsy on the body of any person in a case involving a homi-

cide; suspected homicide; a suicide; a violent, unnatural or suspicious death; an unexpected apparent natural death in an adult; sudden unexpected infant and child deaths; deaths believed to represent a threat to public health or safety; and executed prisoners. When the county medical examiner decides to order an autopsy, the county medical examiner shall notify the district attorney general and the chief medical examiner. The chief medical examiner or the district attorney general may order an autopsy in such cases on the body of a person in the absence of the county medical examiner or if the county medical examiner has not ordered an autopsy. The district attorney general may order an autopsy in such cases on the body of a person in the absence of the county medical examiner or the failure of the county medical examiner to act. The authority ordering the autopsy shall notify the next of kin about the impending autopsy if the next of kin is known or reasonably ascertainable. The sheriff or other law enforcement agency of the jurisdiction shall serve process containing such notice and return such process within twenty-four (24) hours.

In *State v. Darron Clayton*, No. 02C01–9304–CR–00071, 1998 WL 409914 (Tenn. Crim.App., at Jackson, Jul. 23, 1998), *perm. app. denied*, (Tenn. Feb. 16, 1999), the defendant appealed based upon the fact that a law enforcement officer requested the autopsy of the victim. *Darron Clayton*, 1998 WL 409914, at *18. We held that the fact that the law enforcement officer notified the medical examiner did "not affect the examiner's authority to conduct an autopsy." *Id.*

The fact Detective Daniels signed the autopsy order with permission from Assistant District Attorney Effler did not affect the medical examiner's authority to conduct the autopsy. Therefore, this issue is without merit.

### *Admission of Autopsy Photographs*

■ Appellant argues that the trial court erred in admitting certain photographs from the autopsy and crime scene. Appellant specifically argues the prejudicial effect outweighs the probative value of one photograph in particular because the photograph that was admitted was color as opposed to black and white. The photograph in question is from the autopsy showing the victim face-down with "avulsed skin-lifting of the scalp," as described by Dr. Mileusinic. Appellant also states that there are seventeen other photographs to which he objected at trial and their prejudicial effect outweighed their probative value. However, that is the sum of his argument with regard to the other photographs. Appellant references an Appendix attached to his brief and makes no specific arguments as to why each photograph is prejudicial. The State argues that the trial court correctly allowed in the specific photograph in color and states that Appellant's argument with regard to the remaining photographs should be waived for failure to put forth an argument.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn.1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn.Crim.App.1995). To be admissible, evidence must satisfy the threshold deter-

mination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks,* 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by ... the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks,* 564 S.W.2d at 951.

 Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed by their prejudicial effect. *Banks,* 564 S.W.2d at 949–51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth,* 275 S.W.2d 921 (Ky.1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson,* 885 S.W.2d 90, 92 (Tenn.Crim.App.1993).

The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks,* 564 S.W.2d at 950–51. In *Banks,* the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider:

(1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testi-monial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id.*

During the trial court's handling of pretrial motions, one issue addressed was which photographs could be introduced at trial. After hearing arguments about the photographs, the trial court decided that the best course of action would be for the attorneys and the trial court to sit down together in chambers and go over the photographs. The next day, on the record, Appellant's attorney entered objections to eighteen photographs. The trial court ordered the State to produce the photograph in question in both color and black and white and reserved the issue for a jury-out hearing with Dr. Mileusinic, who performed the autopsy, to see if she needed the color photograph to explain her conclusions.

The following occurred at the jury-out hearing:

[The State]. And how do you use, Dr. Mileusnic, photographs in explaining your findings to other people?

A. The photographs in forensic cases, particularly in cases of trauma, are going to indicate the location of the injury, the extent of the injury, the measurements and also all the tissues, layers, body parts involved. And of course, the photographs are always going to be better or—as a visual aid more objective, I would say, in determining the accuracy of report.

Q. Now, concerning the number of impacts, how would you use photographs to explain those type of findings?

A. Blunt head trauma, and this is a case of blunt head trauma, is one of the most complete forensic cases. The number of impacts is always an issue, partic-

ularly if it's a homicide case such as this one. And the description with the measurements can, I guess, elicit some visual picture or image in our mind; however, in this particular case, when one of the potential contentions could be how many blows the victim sustained, I think the photographs will definitely aid in explaining how I was determining the minimum number of blows which I indicated in my autopsy report.

Q. Dr. Mileusinic, if I could show you a black and white photograph of Ms. Brock's head and also a color photograph of that same picture. Which of these two photographs, Dr. Mileusinic, would you best be able to use in explaining your findings?

A. To me, as a physician of forensic pathology, the color photograph is definitely a better objective way of indicating the injury, and the simple reason for that is that in the black and white or gray scale in this particular case, there would be a lot of areas where the shaving of the scalp is uneven. Of course, blunt head trauma, the scalp has to be shaved to demonstrate the injury. And you see the little high lines of residual hair—they don't abstract really the view of the injury; however, in this particular case, they're kind of blending with the injury itself, so it's really hard to tell how far the injury extends, whether this is another type of injury or not, and I would say in black or white or gray scale, there's a lot of intereference from the—if nothing else, the hair itself.

Q. All right.

[The State]: Thank you, Dr. Mileusnic.

The Court: Cross-examine.

[Appellant's attorney]: Yes, your Honor. If I may see those photographs. Cross–Examination By [Appellant's Attorney]:

Q. I think your testimony, Dr. Mileusnic, is, is that they're better—better visual aids—the color would be a better visual aid; is that right?

A. That's correct.

Q. Would be more objective; is that right?

A. Yes.

. . . .

Q. And so you can explain that particular injury without having to even look at the photograph?

A. Oh yeah. I mean, my understanding is not about me, it's about the Jury. I don't think the Jury has even seen and maybe doesn't even have any idea what blunt head trauma is—can understand and perceive the significance.

Q. Okay. This photograph—this black and white photograph, it's your testimony even though color is a better visual aid, you don't think that you can explain through your testimony and using a black and white sufficiently to explain to a jury the extent of these injuries? Is that your testimony?

A. My testimony, I could try, and I will definitely do a decent job. I'm not sure how much [the] Jury would get from it.

. . . .

The Court: The concern of the Court is that there's a potential prejudice to a jury—a lay person looking at these photographs, that they might be overly inflamed by a color photo. My main concern here is, can you adequately explain to a jury using a black and white photo what you need to explain to them concerning cause of death in your entire testimony toward, you know, your forensic examination here. Can you use the black and white as well as you can color?

[Dr. Mileusnic]: I can use anything. As I said, it's not about me. It's about the Jury and whatever you want the Jury to get from this trial.

. . . .

The Court: Based on Dr. Mileusnic's examination and also a review of the photographs, I'm going to allow the color photograph to come in. I'm not sure the black and white as it is has accomplished what I was looking for, and I'm gonna allow it to come in.

[Appellant's attorney objects to the entry of the photograph in color and in black and white]

The Court: You have properly preserved it, and I understand your concerns. I have many of the same concerns that you have. And I am required to weigh these photographs in a—and a—and the balancing test is, you know, the probative value versus the prejudicial effect. Dr. Mileusnic's examination is very probative in this particular case. The Court tried a method that might limit prejudicial value of the photographs by going to black and white, but after review and after hearing her testimony, I—and frankly based on what else is coming in, this particular photograph is apart in quality from the other photographs that were taken at the autopsy. The Court, again, has been very cognizant of the prejudicial effect that might come from the autopsy photographs. I think this particular one, the probative value outweighs that effect, and I'm going to allow it in color. And your objection is noted, and I understand it.

We have reviewed the photograph in question. We agree with the trial court's conclusion based upon the doctor's testimony that the color photograph better demonstrates that extent of the victim's injuries. The probative value of the photo-graph outweighs its potential prejudicial effect. Therefore, we conclude that the trial court did not abuse its discretion in allowing the photograph in evidence.

■ We now turn to Appellant's complaint regarding the remaining seventeen photographs. Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See also State v. Sanders, 842 S.W.2d 257 (Tenn.Crim.App. 1992) (determining that issue was waived where defendant cited no authority to support his complaint).

For his argument with regard to the other seventeen photographs, Appellant directs the Court to the Appendix of his brief where he included a chart setting out the pre-trial exhibit number, the trial exhibit number, a description of each picture, whether the picture is of the autopsy or the crime scene and finally the basis of his objection to the photograph, i.e., "Cumulative," "Unduly Prejudicial/Cumulative," or "Relevance." This chart included in an Appendix to Appellant's brief does not "set[ ] forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief . . ." as is required by Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure. Therefore, we conclude that Appellant has waived this issue with regard to the remaining seventeen pic-

tures to which he objected. *See* Tenn. Ct.Crim.App. R.10(b).

Therefore, this issue is without merit.

### Failure to Preserve Evidence

Appellant argues that the trial court erred in denying his motion to dismiss based upon the State's failure to take fingerprints at the scene of the murder, failure to preserve a bloody footprint at the scene, and failure to preserve "time of death evidence." This argument is made pursuant to *State v. Ferguson,* 2 S.W.3d 912 (Tenn.1999). The State argues that the trial court properly denied the motion to dismiss because the evidence in question and the actions of the State do not meet the requirements set out in *Ferguson.*

▬▬▬ The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial.[3] To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs,* 427 U.S. 97, 110–11, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

In the case of *State v. Ferguson,* 2 S.W.3d 912 (Tenn.1999), the defendant was arrested for DUI. The videotape of various sobriety tests performed by the defendant was inadvertently taped over before his trial. *Ferguson,* 2 S.W.3d at 914. The defendant appealed arguing that the State

violated his Due Process rights by failing to preserve the videotape. In its review of defendant's issue, our state supreme court adopted a test for courts to use in determining whether the loss or destruction of evidence has deprived a defendant of a fair trial. *Id.* at 917. The initial analytical step in this test for determining whether there was any duty to preserve evidence was described as follows:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (quoting *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). The Court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." *Id.* Accordingly, those factors include: "(1) The degree of negligence involved; (2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." *Id.* at 917. "If, after considering all the factors, the trial judge concludes

---

3. "As a general rule, ... a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." *Ferguson,* 2 S.W.3d at 914 n. 3 (citing *Betts v. Brady,* 316 U.S. 455, 62 S.Ct.

1252, 86 L.Ed. 1595 (1942); *Watkins v. State,* 216 Tenn. 545, 393 S.W.2d 141, 144 (1965); *Lofton v. State,* 898 S.W.2d 246, 248 (Tenn. Crim.App.1994)).

that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges." *Id.* However, dismissal is but one of the trial judge's options. *Id.*

■ With regard to what Appellant refers to as "time of death evidence," Appellant's argument consists of a footnote referring this Court to the sufficiency argument included in his brief as well as his argument concerning the order of autopsy. However, Appellant has made no effort to analyze the State's failure to obtain a time of death under the factors set out in *Ferguson.* Therefore, Appellant has failed to present an argument with respect to this issue.

Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that a brief shall contain "[an] argument ... setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record ... relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See also State v. Sanders,* 842 S.W.2d 257, 259 (Tenn.Crim. App.1992) (determining that issue was waived where defendant cited no authority to support his complaint). Therefore this issue is waived with regard to the "time of death evidence."

■ We now turn to Appellant's argument with regard to the failure of law enforcement to collect fingerprint evidence and a bloody footprint on the carpet near the victim's body from the crime scene. Appellant argues that the crime scene processors should have taken latent fingerprints throughout the house and cut out the bloody footprint for analysis.

We must first determine whether the State had a duty to preserve the fingerprint evidence, and the footprint or in this case, collect the fingerprint evidence and the footprint. Therefore, the fingerprint evidence and footprint must "possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

In *State v. Tony Best,* No. E2007–00296–CCA–R3–CD, 2008 WL 4367529, (Tenn.Crim.App., at Knoxville, Sept. 25, 2008), a defendant appealed based upon *Ferguson* regarding the State's destruction of methamphetamine components. 2008 WL 4367529, at *12. The defendant in that case argued that the State destroyed the methamphetamine components before the defendant was allowed to test them for fingerprints to prove that they were not his. *Id.* In our analysis of whether or not the items were of "apparent exculpatory value" we pointed out the following:

This court has previously examined the issue of the State's duty to preserve evidence upon which the defendant could have performed scientific testing that the defendant claims may have yielded exculpatory results. On the one hand, the State is not required to investigate cases in any particular way: "Due process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process." *State v. Terry W. Smith,* No. 01C01–9609–CC–00404, 1998 WL 918607, at *14 (Tenn.Crim. App. at Nashville, Dec. 31, 1998); *see also State v. Donald Terry Moore,* No.

01C01–9702–CR–00061, 1998 WL 209046, at *9 (Tenn.Crim.App. at Nashville, Apr. 9, 1998) (observing that the State is not required to perform scientific testing, such as DNA analysis, on evidence), *aff'd*, 6 S.W.3d 235 (Tenn. 1999). Moreover, "[i]t is not the duty of this Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates." *State v. Robert Earl Johnson*, No. M2000–01647–CCA–R3–CD, 2001 WL 1180524, at *17 (Tenn.Crim.App. at Nashville, Oct. 8, 2001). Accordingly, when the police have not conducted a fingerprint analysis, there is typically no duty to preserve what is essentially non-existent evidence. *See State v. Kenneth Clay Davis*, No. E2006–01459–CCA–R3–CD, 2007 WL 1259206, at *4 (Tenn. Crim.App. at Knoxville, Apr. 30, 2007), *perm. to appeal denied*, (Tenn.2007) (holding with regard to the absence of a recording of the traffic stop that the "State cannot destroy evidence that does not exist"); *State v. Randall S. Sparks*, No. M2005–02436–CCA–R3–CD, 2006 WL 2242236, at *5 (Tenn.Crim.App. at Nashville, Aug. 4, 2006) (holding that State had no duty to preserve recordings of drug transactions because recordings did not exist); *see also John Darryl Williams–Bey v. State*, No. M2005–00709–CCA–R3–PC, 2006 WL 2242263, at *7 (Tenn.Crim.App. at Nashville, Aug. 4, 2006) (affirming post-conviction court's finding that counsel was not ineffective for failing to seek non-existent fingerprint evidence or curative jury instruction therefor).

*Tony Best*, 2008 WL 4367529, at *13–14.

Under this analysis, it appears that the State did not have a duty to collect fingerprint evidence nor collect the bloody footprint. As stated above, due process does not require the State to collect the evidence in question. We conclude that for purposes of the *Ferguson* analysis, the fingerprint evidence and the bloody footprint do not exist. Therefore, the State does not have a duty to preserve the evidence. *See Kenneth Clay Davis*, 2007 WL 1259206, at *4.

### *Rebuttal Witness*

 Appellant argues that the trial court erred in allowing the State to introduce propensity evidence in rebuttal after its cross-examination of Appellant. Appellant argues that this was improper under Rule 404(b) of the Tennessee Rules of Evidence. The State argues that the cross-examination and introduction of the evidence through a rebuttal witness is allowed pursuant to Rule 608 of the Tennessee Rules of Evidence.

On its cross-examination of Appellant, the State asked Appellant questions concerning an incident where Appellant, in a rage, allegedly stormed through the school where the victim worked. The State brought the school resource officer, Merlene Richards, into the courtroom to see if he recognized her or not. The State also asked Appellant if Ms. Richards had tried to stop him from storming into the school. Appellant denied throughout the questioning that he had ever arrived at the school in a rage, stormed to the victim's classroom or argued with her at the school during school hours. He did acknowledge that he recognized Ms. Richards from her attendance at a "ball game" held at the school.

After Appellant concluded his proof, the State put on its rebuttal proof. The first rebuttal witness was Ms. Richards. After she testified to her background and the fact that she worked as a school resource officer at the school with the victim, Appellant made a request pursuant to Rule 404

of the Tennessee Rules of Evidence. Appellant's attorney argued that the witness's testimony was improper pursuant to Rule 404. The trial court overruled the objection. Ms. Richards began to testify about the victim coming to school several days and it being difficult for her to walk or that she appeared stiff and had many bruises. Ms. Richards also stated that the victim was wearing long sleeves even though the weather was warm. Appellant again objected. Trial court subsequently decided to hold a hearing out of the presence of the jury. Appellant stated that he objected on the basis that the State was attempting to "backdoor" "character evidence to show conformity or propensity." The State argued that Appellant had maintained he was not aggressive towards the victim, the State cross-examined him on it, and the State was entitled to introduce rebuttal testimony demonstrating he was aggressive towards her.

The trial court concluded that the evidence was relevant under Rule 404 and that its probity outweighed any prejudice under the balancing test set out in Rule 403. The trial court called for an offer of proof from the witness. Following the offer of proof, the trial court made a ruling with regard to the witness's testimony. The trial court concluded that the witness would be restricted to testifying about her observations of Appellant. She could not testify as to the content of the argument because during the offer of proof, she stated she could not hear the words being spoken. The trial court restricted any testimony by the witness as to statements by the victim to the witness about the victim and Appellant arguing about his buying a motorcycle or as to bruises the witness observed on the victim.

At the conclusion of the trial court's ruling, Appellant's attorney reminded the trial court that Ms. Richards had testified to some bruising before the jury-out hearing. The trial court suggested a curative instruction, but Appellant's attorney stated he did not want the instruction for fear of "resolidifying" the issue of the bruises.

The witness testified to the following occurrence in the spring semester of 2005:

A. I was standing in front of the school and [Appellant] approached the school very irate and came into the school, and I said, "Sir, you need to sign in at the office," and he kept going down the hallway pointing toward Ms. Brock's room. And I went into the office and asked Anita Taylor who he was and if this was normal behavior for him, and she said, no, she—

. . . .

Q. Anyway, you notified [Executive Assistant Principal Anita Taylor] and then what—after you notified her about this man going down the hall, what did you do?

A. I went down the hallway following him.

Q. And what was the manner in which he was traveling down that hallway?

A. Very fast, very irate and very fast moving.

Q. Now, when you told him to stop and sign in did he follow that instruction?

A. No, he kept going down the hallway.

Q. And what happened then?

A. I followed him to Mrs. Brock's room, and he was arguing with her and I stood at the doorway. And he was talking very loud and she was talking very soft, asking him to leave and that they would discuss that later that evening.

Q. And were you concerned about Janet Brock?

A. Yes, I was. I was very concerned about her.

Q. And how was he acting at that time?

A. He was very irate and arguing very loud.

■ We first address Appellant's contention that "the trial court erroneously concluded that the defendant had opened the door" to information concerning whether or not he was abusive towards his wife. The following occurred during Appellant's direct examination:

Q. Have you ever been physical as far as when you and Ms. Brock were having these disagreements or anything like that—did you ever—

A. No.

Q. —punch Mrs. Brock?

A. No.

Q. Did you ever hit Mrs. Brock?

A. No.

. . . .

A. No. If we ever got into a disagreement, we would separate, we would leave.

Q. Was that a mutual decision?

A. It was a mutual decision between both of us. We would go, time to ourselves, collect our thoughts and then come back, sit down and discuss the problem.

Therefore, there is no question that Appellant put his treatment of the victim squarely at issue in his trial.

■ Any competent evidence which explains or directly applies to evidence introduced by the accused is admissible in rebuttal. *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn.Crim.App.2000). "The state is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" *Id.* (quoting *State v. Cyrus Deville*

*Wilson*, No. 01C01–9408–CR–00266, 1995 WL 676398, at \*9 (Tenn.Crim.App., at Nashville, Nov. 15, 1995)). The admission of rebuttal evidence, as well as the scope of such evidence, is within the sound discretion of the trial judge. *State v. Reid*, 213 S.W.3d 792, 831 (Tenn.2006).

In *State v. Patton*, 593 S.W.2d 913 (Tenn.1979), the defendant was indicted for shooting and killing his wife. On appeal, the defendant argued that the trial court had erroneously allowed in testimony regarding his violent tendencies toward the victim. Our supreme court held that because the defendant in *Patton* had put his treatment of the victim at issue, it was proper for testimony on the issue of his treatment of the victim to be included in the State's rebuttal. *Patton*, 593 S.W.2d at 917. Therefore, "[p]rior bad acts are admissible to rebut a defendant's claim of having led a peaceful, normal life." *State v. Nichols*, 877 S.W.2d 722, 732 (Tenn. 1994) (citing *Patton*, 593 S.W.2d at 917).

As stated above, there is no dispute that Appellant put his treatment of the victim at issue during his proof. Under the case-law in our state, proof of prior bad acts to rebut a defendant's contention to the contrary is admissible at trial. We find no abuse of discretion on the part of the trial court in allowing the State to put on proof during rebuttal to the contrary of the evidence presented by Appellant. Therefore, we conclude that the trial court did not abuse its discretion in allowing the evidence regarding Appellant's altercation with the victim at the school.

### *Sufficiency of the Evidence*

■ Appellant argues that the evidence is insufficient to support his conviction. He argues that he has provided an alibi for the hours between 4:00 a.m. and 7:00 a.m., therefore, he could not have been the murderer. In addition, he argues

that the absence of any physical proof connecting him to the murder is further proof that he cannot be the murderer because his conviction cannot be based solely on his statement confessing to the murder. The State argues that the evidence is indeed sufficient.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the state. *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn.1994); *State v. Harris,* 839 S.W.2d 54, 75 (Tenn.1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R.App. P. 13(e); *Harris,* 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle,* 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan,* 929 S.W.2d 380, 383 (Tenn.Crim.App.1996); *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn.Crim.App.1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Mat-*

*thews,* 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett,* 788 S.W.2d 559, 561 (Tenn.1990).

Of course, a criminal offense may be established exclusively by circumstantial evidence. *State v. Tharpe,* 726 S.W.2d 896, 900 (Tenn.1987); *State v. Jones,* 901 S.W.2d 393, 396 (Tenn.Crim.App.1995). However, the trier of fact must be able to "determine from the proof that all other reasonable theories except that of guilt are excluded...." *Jones,* 901 S.W.2d at 396; *see also, e.g., Tharpe,* 726 S.W.2d at 900.

Appellant's claims that he provided an alibi starting at 4:00 a.m. based upon the cell phone records. The cell phone records do show that calls were being placed through different locations between Harrogate and Morristown. The earliest direct evidence presented of his whereabouts on the morning in question is the video surveillance tape presented during the testimony of the Walmart loss prevention security agent which placed him at Walmart at 5:23 a.m. He also was seen by the victim's brother-in-law at Walters State Community College at 6:00 a.m. These two sightings do not preclude Appellant from being the perpetrator. There was ample opportunity before 4:00 a.m. for him to have beaten the victim, cleaned up and attempted to hide various pieces of evidence before he left the house to drive to Morristown.

Appellant also argues that he cannot be convicted solely based upon his statement to the police. *See State v. Housler,* 193 S.W.3d 476, 490 (Tenn.2006). His contention is true, however, our supreme court also stated that "the state needs 'only slight evidence ... to corroborate a confession and sustain a conviction.'" *Id.*

(quoting *State v. Smith*, 24 S.W.3d 274, 282 (Tenn.2000)). In addition, circumstantial evidence is sufficient to corroborate such a statement. *State v. Jones*, 15 S.W.3d 880, 891 (Tenn.Crim.App.1999).

In his statement, Appellant stated that he rode the bicycle from his house and left it in a ditch. Mr. Leach found the bicycle in a ditch. Appellant stated that he threw the bat out of the window of his truck while driving on the road on which he lives. The bat was found in a field down the road from his house. He also stated that he took the victim's jewelry and wallet and wrapped them in a jacket that he left in the truck. The victim's jewelry and wallet were found wrapped in a jacket found in Appellant's truck. Appellant stated that he beat his wife with a metal baseball bat. Dr. Mileusinic–Polchan testified that the victim's death was the result of blunt trauma. The weapon used in the beating was elongated and not too wide. She opined that it could have been a bat. Mr. James, who testified concerning bloodstain patterns stated that there were two circular transfer bloodstains on the carpet near the victim that were consistent with the end of a bat. We conclude that this evidence is sufficient to corroborate Appellant's statement.

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39–13–202(a)(1). Tennessee Code Annotated section 39–13–202(d) provides:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to

determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. T.C.A. § 39–13–202(d). Therefore, in order to convict Appellant of his indicted offense, the State was required to prove beyond a reasonable doubt that the defendant killed the victim with "premeditation."

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence." *State v. Brown*, 836 S.W.2d 530, 541 (Tenn.1992). Premeditation is a question of fact to be determined by the jury. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn.2000). And, the jury may infer premeditation from the manner and circumstances of the killing. *See, e.g., State v. Pike*, 978 S.W.2d 904, 914 (Tenn.1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn.1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn.Crim.App.1995). Our courts have enumerated several factors that may support the existence of premeditation, including: a prior relationship that might suggest motive; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; infliction of multiple wounds; preparation before the killing for concealment of the crime; destruction or secretion of evidence of the murder; and the appellant's demeanor before and after the killing, including calmness immediately after the killing. *See State v. Nichols*, 24 S.W.3d 297, 302 (Tenn.2000); *Pike*, 978 S.W.2d at 914–15; *Bland*, 958 S.W.2d at 660. *See also State v. Gentry*, 881 S.W.2d 1, 4–5 (Tenn.Crim. App.1993); *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn.Crim.App.1992).

In the case sub judice, the State presented evidence meeting several of the

above-enumerated factors. The State presented the fact that Appellant was having an extramarital affair indicating that there was trouble in his marriage to the victim. This is suggestive of a motive for the murder. There is no question that the beating death was particularly cruel and that there were more than several wounds inflicted. Dr. Mileusinic–Polchan testified that she identified a minimum of 74 blows to the victim. She also stated that the beating lasted an extended period of time and that the victim's death was not instantaneous. She also testified that the victim fractured fingers on both hands where the bone was visible. Dr. Mileusinic–Polchan concluded that the victim would have been in constant pain from sustaining the initial injury until her death. In addition, the evidence showed that Appellant went to great lengths to try to conceal his crime. He cleaned himself up and discarded the clothing he was wearing during the beating. He also made an attempt to mislead the police into thinking that someone else had committed the crime by taking the victim's belongings and leaving a trail by riding the bicycle from his house to a ditch. In addition, Appellant attempted to hide the murder weapon. These factors all support the jury's conclusion that Appellant killed his wife with premeditation.

Based upon the facts presented at trial when taken in a light most favorable to the State, we conclude that a reasonable jury would conclude that the evidence was sufficient to support the jury's verdict.

Therefore, this issue is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.